FILED

2005 Feb-07  PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN SEAMAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-03-Y-69-S** |
| | ) | |
| **JEFFERSON COUNTY** | ) | |
| **PERSONNEL BOARD,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This matter is before the court for review of the decision of the court-appointed Receiver of the Jefferson County, Alabama, Personnel Board ("Personnel Board" or "Board"), Ronald R. Sims, Ph. D., to terminate the employment of John E. Seaman, Ph. D., as manager of the Board's Research and Validation Division.

An evidentiary hearing was conducted by United States Magistrate Judge Harwell G. Davis, III, pursuant to the terms of the order and memorandum opinion entered by this court on July 8, 2002, in *United States v. Jefferson County, Alabama, et al.*, Civil Action No. 75-S-666-S, imposing a receivership upon the Board. The magistrate judge issued a report and recommendation concluding that the decision of the Receiver should be reversed, and that Dr. Seaman should be reinstated.[1]  For the

---

[1]The Board since has been restructured, and the position formerly occupied by Dr. Seaman no longer exists.

reasons stated herein, this court reviews the Receiver's decision *de novo*, and concludes that termination of Dr. Seaman's employment should be sustained.

## I. STANDARD OF REVIEW

This court reviewed the disciplinary appeals process for Jefferson County merit system employees in the July 8, 2002 memorandum opinion entered in conjunction with the order appointing Ronald R. Sims, Ph. D. ("Dr. Sims") as Receiver of the Personnel Board. That opinion observed, in part, that:

> section 22 of Act No. 248 [the "Enabling Act"] governs the dismissal and suspension of merit system employees. An "appointing authority"[2] may dismiss or demote an employee for just cause "whenever [the appointing authority] considers the good of the service will be served thereby, for reasons stated in writing, served on the affected employee, and a copy furnished to the Director [of the Board], which action shall become a public record."[3] The affected employee has ten days to appeal the action by filing an answer to the charges with the Board. The Board must conduct a public hearing, either before the Board, or before a

---

[2]Section 1 of the Board's Enabling Act has never been amended, and defines the terms "appointing authority" or "appointing Power" as meaning a

> person, officer, board, council, commission or other body including the County Board of Health whose lawful jurisdiction or powers are confined wholly or primarily within the territorial limits of such county and who or which possesses final power to appoint persons to services, jobs, offices or positions, the compensation of which is paid in whole or in part from the public funds of such county or from the public funds of a municipality in such county subject to this Act. . . .

Act No. 248, 1945 Acts of Alabama, at 376-77.

[3]Section 22 of the 1945 re-enactment of the Board's Enabling Act subsequently was amended five times. *See* Act No. 562, 1947 Acts of Alabama; Act No. 670, 1953 Acts of Alabama; Act No. 1600, 1971 Acts of Alabama; Act No. 679, 1977 Acts of Alabama; and Act No. 684, 1977 Acts of Alabama.

hearing officer appointed by the Board. If a hearing officer is appointed, that person must take testimony from the employee and the appointing authority, and submit to the Board within five days findings of fact and conclusions of law, and a recommended decision. The Board then must consider the hearing officer's report and recommendation during its next regular meeting, and may modify, alter, set aside, or affirm. If the Board hears the appeal, it must make findings of fact and law and issue a decision. In either case, the Board certifies its findings to the appointing authority to effectuate the decision.[4] Either party may appeal the Board's decision to the Circuit Court of Jefferson County for review by a three-judge panel. The circuit court reviews questions of law, and whether the Board's decision is supported by substantial evidence.[5]

The Order imposing a Receivership upon the Personnel Board did not abrogate the foregoing provisions of state law, *except* with respect to disciplinary actions against employees of the Board during the duration of the Receivership: *i.e.*,

> Consistent with the powers vested in the Receiver by paragraph 2(b) above, however, the members of the Jefferson County Personnel Board shall *not perform* the [Board's quasi-judicial functions] with respect to employees of the Personnel Board. Instead, for the duration of the Receivership imposed by this order, (*i*) any employee of the Jefferson County Personnel Board holding permanent status, and who is subject to demotion, suspension, discipline, or termination at the instance of the Receiver, shall be entitled to a due process hearing before a magistrate judge of this court randomly drawn, who shall apply the same standards of review as would otherwise be applied by the Personnel Board in such matters*, but for the existence of this court's

---

[4]Part of the Board's role is to ensure system-wide consistency for disciplinary actions. *See* Personnel Board of Jefferson County's Response to Show Cause Order (doc. no. 890 in Civil Action No. CV-75-S-666-S), at 8.

[5]Defendant's Ex. 68 (a copy of the memorandum opinion entered by this court in *United States v. Jefferson County, Ala., et al.*, No. CV-75-S-666-S (N.D. Ala. July 8, 2002), as doc. no. 934), at 80-81.

order. *See* 28 U.S.C. §§ 636(b)(3),[6] 1651.[7]  Any employee wishing to avail himself of this procedure shall notify the Receiver in writing, and file a copy with the Clerk of this Court, within ten (10) calendar days after notification of the contested employment action.  Within ten (10) calendar days thereafter, the Receiver shall file with the Clerk of this Court a copy of the written notice of the contested employment action and a written statement of the reasons for the action taken with respect to the employee.  The Clerk shall draw at random a magistrate judge of the court, who shall conduct a hearing on the matter within ten (10) working days after the Receiver's statement of reasons.  The hearing may be continued for not more than thirty (30) days on agreement of the parties or on motion for good cause shown.  Upon completion of the hearing, the magistrate judge shall file his written findings and conclusions of law, together with a recommendation for disposition of the appeal.  Either party may file objections to the magistrate judge's finding and conclusions within ten (10) calendar days after they are entered, and this court shall thereafter enter such orders as may be appropriate.  . . .[8]

The July 8, 2002 order appointing the Receiver did not specifically identify the standard of review to be applied by *this court* when reviewing a magistrate judge's findings of fact, conclusions of law, and recommendation with respect to disciplinary

---

[6]That statute provides:  "A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States."  28 U.S.C. § 636(b)(3).

[7]Section 1651 provides as follows:

(a)  The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b)  An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

28 U.S.C. § 1651.

[8]*United States v. Jefferson County, Ala., et al*., No. CV-75-S-666-S (N.D. Ala. July 8, 2002), doc. no. 935 ¶ 11, at 11-12 (emphasis in original) (bracketed footnotes added).

appeals.  Thus, an analysis of the appropriate standard is in order.

At the outset, the court observes that, in his report and recommendation, Magistrate Judge Davis stated:  "[p]ursuant to the Order of Judge Smith, this matter is being reviewed by the undersigned Magistrate Judge *as if sitting as a three-judge state circuit court appellate panel hearing a Jefferson County Personnel Board appeal.  Thus, the evidence will be considered de novo*."[9]  This statement is erroneous on two levels.  *First*, this court's July 8, 2002 order *clearly* states that the assigned magistrate judge "shall [*i.e., must*[10]] apply *the same standards of review as would otherwise be applied by the Personnel Board in such matters,* but for the existence of this court's order" — *not* the standard that would be applied by a three-judge state circuit court appellate panel hearing an appeal from the Personnel Board.  *Second*, the standard of review employed by a three-judge state circuit court appellate panel is whether substantial evidence supports the decision of the Personnel Board, *not* the "*de novo*" standard adopted by the magistrate judge.

With regard to the standard of review to be applied by *this court*, Dr. Seaman's primary position is that this court should not review the magistrate judge's report and

---

[9]Doc. no. 9 (Report and Recommendation), at 87 (emphasis supplied).

[10]In legal usage, the word "shall" is construed as imposing a mandatory duty on the subject of the sentence.  *See Black's Law Dictionary* 1497 (8th ed. 2004) ("Has a duty to; more broadly, is required to . . . .  This is the mandatory sense that drafters typically intend and that courts typically uphold."); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 939-41 (2d ed. 1995) (discussing "Words of Authority").

recommendation *at all*; instead, he argues that "[t]he parties are entitled as a matter of law to review of the magistrate's decision by certiorari to the [Alabama] Court of Civil Appeals."[11]  Alternatively, Dr. Seaman urges this court to review the magistrate judge's report and recommendation as though the court were sitting as a three-judge state circuit court appellate panel reviewing a decision of the Personnel Board.  As noted above, in such circumstances the Board's decision must be affirmed if substantial evidence supports it.  *See City of Birmingham v. Personnel Board of Jefferson County*, 464 So. 2d 100 (Ala. Civ. App. 1984).  "Substantial evidence is relevant evidence that a reasonable mind would view as sufficient to support the determination."  *Ex parte Personnel Board of Jefferson County*, 440 So. 2d 1106, 1109 (Ala. Civ. App. 1994) (citing *Ex parte Morris*, 263 Ala. 664, 83 So. 2d 717 (1955)).  That standard also accords substantial deference to decisions of the three-member Personnel Board — *the duties and powers of which were transferred by this court to the Receiver* — for such reasons as the following:

> Agencies tend to develop a recognized competence or expertise in the specific fields of operation entrusted to them by the legislature, and judicial deference to the administrative agency in the first instance tends to insure uniformity and consistency of decisions in these special areas.  Initial review of a matter by an agency can do more than merely assist a court in its consideration; it might alleviate entirely any need to

---

[11]Doc. no. 14 (Objection of Plaintiff to Portions of the Report and Recommendation of Magistrate), at 6.

invoke the court's aid.  However, if judicial review is ultimately
necessary, the special competence of the agency lends great weight to
its reasoning and decision.  When the legislature delegates a
discretionary function to an agency to be exercised in light of the
agency's special competency, a court frustrates legislative intent and
usurps that discretionary role by stepping in when the agency's choice
is not clearly unreasonable or arbitrary.

*Ex parte Personnel Board of Jefferson County, Alabama*, 440 So.2d 1106, 1109 (Ala.

Civ. App. 1983) (citations omitted).  Here, however, the report and recommendation

of the magistrate judge is not entitled to the same deference accorded "special

competence" or "expertise" in public employment, such that narrow, limited review

under the "substantial evidence" standard would be appropriate.

On the other hand, the Receiver correctly suggests that the magistrate judge

assumed the role of a hearing officer appointed by the three-member Personnel Board

when taking evidence in this action, and that the proper role of this court is to

consider his findings of fact and conclusions of law *de novo*, and modify, alter, set-

aside, or affirm his recommendation, as appropriate, consistent with the Personnel

Board's Enabling Act.  The Receiver argues that such review also comports with the

provisions of 28 U.S.C. § 636, which provides, in pertinent part, that

> a judge may also designate a magistrate judge to conduct hearings,
> including evidentiary hearings, and to submit to a judge of the court
> proposed findings of fact and recommendations for the disposition, by
> a judge of the court . . . .

Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(B).

The court finds that the standard for reviewing the magistrate's recommendation advocated by the Receiver is consistent with the Enabling Act, as well as the federal statutory scheme governing referral of the matters addressed in this action to a magistrate judge. Therefore, the court will review *de novo* the magistrate judge's report and recommendation, addressing the Receiver's decision to terminate Dr. Seaman's employment. According to the Rules and Regulations of the Personnel Board that were in effect on the date of the hearing, the scope of the inquiry is "whether or not the employee, by reason of his act or acts as charged and his record of service, merits retention in the service or should be removed therefrom."[12]

## II. FACTUAL BACKGROUND

This matter is collateral to the enduring controversies of *United States v.*

---

[12]Defendant's Ex. 66 (Rules & Regulations of the Personnel Board of Jefferson County, rev. Nov. 1995), Rule 6.6.

*Jefferson County, Alabama, et al.,* Civil Action Nos. CV-74-S-12-S, CV-74-S-17-S, and 75-S-666-S — a cluster of consolidated and intervening class actions whose remote and recent history is well documented in *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994), and in this court's July 8, 2002 memorandum opinion and order imposing a Receivership upon the Personnel Board.[13]  To provide context, however, a summary of the factual background and procedural history relevant to disposition of this matter is necessary.

For decades, the Jefferson County Personnel Board — both the entity itself and its three-member Board — abdicated the Board's Constitutional, statutory, and professional obligations by failing to establish lawful employee selection procedures,[14] as the Board had agreed to do in the consent decree first entered in 1981, then modified in 1995, and extended in December of 2000.  This abdication was due to an ignorance of (or indifference to) the Board's legal responsibilities on the part of those charged with directing the Board, and staff incompetence, among other factors.

---

[13] *See* Defendant's Ex. 68.

[14] "Selection procedure" generally refers to any measure, combination of measures, or procedures used as a basis for any employment decision, including the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, education, and work experience requirements through informal or casual interviews and unscored application forms. *See Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. § 1607.16(Q).

These controversies were reassigned to the undersigned judicial officer during April of 2000, upon the retirement of former Chief United States District Judge Sam C. Pointer, Jr.  At that time, Ben Payton was Personnel Director of the Board, and the Board's staff was organized into four divisions:  Employment and Administration; Classification and Compensation; Employee Relations; and Research and Validation. The plaintiff, John Seaman, then was Manager of the Research and Validation Division ("R&V Division"), which was responsible for recruitment, screening, and, *development and administration of employee selection procedures*: *i.e.*, the "heart" of these clustered class-actions.

During a status conference conducted on October 30, 2000, the court asked the parties to report on the status of "the case," and to submit a schedule for completing the work remaining to be done in accordance with, *e.g.*, the Board's 1981 consent decree and 1995 modification order.  Another status conference was conducted on November 20, 2000, during which counsel for the Board presented a proposed schedule for development of selection procedures for the fifty-eight job classifications remaining under federal court scrutiny.  Counsel for the Board also provided to the court, shortly before the status conference commenced, a document entitled "Consent Decree Strategic Plan — Detailed Version."  In pertinent part, that "Strategic Plan" called for an increase in staffing, temporary reassignment of staff

from other divisions to the R&V Division, and temporary restructuring of the division.  With respect to the latter initiative, the plan called for assignment of most of the R&V Division's staff to work exclusively on "consent decree" job classifications.  The division's remaining staff — consisting of Dr. Seaman, four personnel analysts and other, temporarily assigned, staff members — was responsible, under Dr. Seaman's direction, for "non-consent decree" classifications.  The plan also called for implementation of certain "business method oriented strategies," including: requiring jurisdictions to fill vacancies from existing registers; using so-called "related lists" to fill vacancies; continuing the use of provisional appointments;[15]

---

[15]A "provisional appointment" is used to temporarily fill a vacancy when there is no register of eligible candidates in place for a particular classification.  Under the Rules and Regulations of the Personnel Board in effect at the time of Dr. Seaman's termination,

> [i]n the absence of an eligible list, the Board may authorize the filling of a vacancy by provisional appointment.  Any such candidate for provisional appointment must meet education, experience and related requirements set forth by the Director.  Provisional appointments shall be for a period of not more than four (4) months.  No provisional appointment shall be continued for more than ten (10) days after the establishment of any eligible list for the class.  Any provisional employee failing to qualify by examination shall be separated from the service after the appropriate eligible list is certified.  The provisional appointment of any individual shall not confer on the appointee any rights of status, appeal or related rights set forth under these Rules.

Defendant's Ex. 66, Rule 4.9(c).  In other words, provisional appointments should have been made for no more than four months, but it was the Board's practice prior to imposition of the receivership to extend such appointments.  Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 122-23.  *This, of course, simply was an expedient means of circumventing the Board's responsibility to devise and administer selection procedures that complied with federal Constitutional and statutory requirements.*

expanding the use of personal services contracts; expanding the use of "training and experience qualifying examinations";[16] and closing "open-continuous" and "open-until-filled" job announcements.[17]   Although the court adopted, with modification, the Personnel Board's proposed *compliance schedule* in the order entered December 18, 2000, the court was *not* asked to — and, in fact, *did not — approve the Board's so-called* "*Strategic Plan.*"[18]

The ensuing events ultimately culminating in the court's appointment of a Receiver to assume control of the Personnel Board, and to assume responsibility for discharging the Board's federal Constitutional and statutory responsibilities, were described in the memorandum opinion of July 8, 2002, a portion of which recorded the following facts:

> The Board conceded that its existing selection procedures for fifty-eight job classifications (police/deputy sheriff sergeant, firefighter, and fifty-six non-public safety classifications) had adverse impact on the basis of race or sex (or both), and could not be defended as lawful.[19]

---

[16]According to Dr. Seaman, a "training and experience qualifying" selection procedure is one in which the applications of all applicants who meet the minimum qualifications established for the job classification are given a numerical score of "70" and the names of the qualifying applicants are placed on a register of persons eligible for employment *without differentiation*.  A "training and experience" questionnaire selection procedure is one in which the applications of all applicants who meet the minimum qualifications are further rated based on established criteria, and are assigned a differentiated numerical score.  Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 39-43.

[17]Plaintiff's Ex. 58.

[18]*See generally* doc. no. 707 in Civil Action No. CV-75-S-666-S (transcript of November 30, 2000 status conference).

[19]Doc. no. 919 in Civil Action No. CV-75-S-666-S (Affidavit of Mary Beth Vrabel), Ex. 1

Even so, the Board confidently assured this court that it could develop new, lawful selection procedures for all fifty-eight classifications in short order. The Board submitted a detailed schedule supporting its proposal, which allocated twelve months for the Board to develop and administer selection procedures meeting the requirements of paragraph 12 of the 1995 Modification Order, and three additional months for party and court review. The Board proposed to extend the 1995 Modification Order until March of 2002. In essence, the Board proposed to complete in twelve months the work it had failed to accomplish during the preceding five years. For that reason, this court viewed the Board's proposal with a jaundiced eye, and perceived it as being, at best, incongruously optimistic.

Accordingly, when extending the Board's 1981 Consent Decree and 1995 Modification Order, this court established a more realistic set of time limits for the Board to complete its remaining tasks. This court's December 18, 2000 order required the Board to develop lawful employee selection procedures in accordance with a detailed schedule, specifying position-by-position, step-by-step, deadlines for each task.[20] Significantly, each deadline specified in the order either had been proposed by, or was more generous than the schedule requested by, the Board.

The Board still failed to meet many deadlines.

Worse, within three months of entering the December 18, 2000 order, the Board moved the court to extend the deadlines for forty-one of the fifty-six non-public safety job classifications.[21]

Based on the foregoing facts, among many others discussed in the opinion, the

---

(deposition of James Johnson), deposition exhibit 1 (contained in supplemental filing of exhibits (doc. no. 924)).

[20]See doc. no. 708 in Civil Action No. CV-75-S-666-S (Order Extending 1981 Consent Decrees and 1995 Modification Orders, entered December 18, 2000).

[21]See doc. no. 763 (Notice of Commencement of Criminal Contempt Proceedings, and, Order to Show Cause).

court instituted criminal contempt proceedings against the Board, the individual members of the Personnel Board (James Johnson, Temple W. Tutwiler III, and Robin Burrell), the Board's Personnel Director (Ben Payton), and its Industrial/Organizational Psychologist (Michael Blair) on June 1, 2001. Birmingham attorney Charles A. Powell, III, was appointed Special Prosecutor to investigate whether prosecution of criminal contempt charges was warranted for the Board's numerous failures to comply with the court's orders. Following a thorough investigation, the Special Prosecutor determined that there was not sufficient evidence to support the prosecution of criminal contempt charges against the individual defendants, and recommended dismissal of defendants Johnson, Tutwiler, Burrell, Payton, and Blair. Ultimately, the Special Prosecutor also recommended dismissal of the criminal contempt proceedings against the Board itself.

Even the threat of criminal contempt proceedings proved insufficient to impress upon the Board, its individual Board members, or the Board's staff the imperative of complying with the consent decree, because, following dismissal of criminal contempt proceedings, the Board failed miserably in the development and administration of a lawful selection procedure for the police and deputy sheriff's sergeant promotional examination. That debacle also is recounted in the court's July

8, 2002, memorandum opinion,[22] and will not be repeated here.  It is sufficient to state that the Board's failure to develop and implement lawful selection procedures for promotion to the rank of police and deputy-sheriff sergeant — *more than five years after the deadline established in its 1995 Modification Order* — was, metaphorically speaking, "the last straw."

On April 4, 2002, the Wilks Class, joined by the Martin plaintiffs and Bryant intervenors ("the Martin/Bryant parties"), moved the court to hold the Personnel Board in civil contempt for failure to comply with its 1995 Modification Order and the December 18, 2000 order extending the Personnel Board's consent decree.[23]  The court directed the Board to show cause why it should not be held in contempt and, if so adjudged, why a receiver should not be appointed to assume control of all functions of the Board.[24]  In its response, the Board conceded that it had failed to comply with the court's orders, but insisted that it "had tried its best."

Thus, more than twenty-eight years after this litigation was commenced, this court concluded that the Board's "best" was not good enough.  Based upon an extensive evidentiary record, this court adjudged the Personnel Board to be in civil

---

[22]*See* Defendant's Ex. 68, at 43-56.

[23]Doc. no. 884 in Civil Action No. CV-75-S-666-S.  By that time, Payton had retired from his position as Executive Director, and the three-member Board named Greg James as Acting Director of the Personnel Board.  James continued to function in that role until the Receiver was appointed on July 8, 2002.

[24]Doc. no. 886 in Civil Action No. CV-75-S-666-S.

contempt on July 8, 2002, for violating the terms of the December 18, 2000 order extending the Board's 1981 consent decree and 1995 Modification Order, and appointed Ronald R. Sims, Ph. D., as Receiver.[25]

When the Receiver first arrived at the Board's offices on July 8, 2002, he addressed all staff members who were present, and made available copies of both the order appointing him as Receiver, as well as the accompanying memorandum opinion. The Receiver told staff that he had been charged by the court with reforming the Board, and that he would need their assistance in accomplishing that goal. The Receiver gave the following account of his initial meeting with the Board's staff:

> [I told the Board's employees that] I had been given a charge, accepted responsibility of reforming the Board, that I intended to — my words were to fix the Board; that the only way that I could fix the Board was with their help. That I expected that we would do this together, that

_____

[25]Dr. Sims's qualifications were detailed in the July 8, 2002 Memorandum Opinion and attachments to the accompanying order, but the following is a summary:

> Dr. Sims is Floyd Dewey Gottwald Senior Professor in the Graduate School of Business at the College of William and Mary in Williamsburg, Virginia. He teaches, among other subjects, organizational behavior, leadership, change management, human resources management, and business ethics. He has published extensively in the area of organizational behavior, including recent papers on change in public-sector organizations and team-building. He previously served on the executive board of the Academy of Management's Organizational Development and Change Division. Dr. Sims has successfully consulted on organizational development and change for over twenty-one years. None of the fifteen other persons suggested or considered by this court as candidates for Receiver possess Dr. Sims's combination of practical experience in, and systematic research on the means and methods of effecting, organizational change.

Defendant's Ex. 68, at 99-100.

> I would assure them that I would be their advocate.
>
> I would make sure it was clear what rules we were supposed to follow, and that the rules and regulations that were in effect were the ones that we were going to follow, that I expected everybody to do the right things and do the right things well.  That I did not want to spend time harping on what had happened in the past.  No fingerpointing, no blaming.
>
> I expected people to be honest, bring problems to my attention, and also to make sure that I — they understood I had an open door policy.  That, under no circumstances, would I expect somebody to feel as if they were going to be penalized for yesterday as far as I was concerned.
>
> My approach in this situation is always a clean slate.  You start from scratch.  They would be held accountable for anything they did from there on in.[26]

Later that same day, the Receiver met with the Board's division heads, including Dr. Seaman.  During the meeting, the Receiver told Dr. Seaman and the other division managers that:

> I needed their assistance in this process, that in a leadership role that they were going to be the ones that on a day-to-day basis had to make sure that, if we were going to right the ship and do the right things, that they would have to accept some responsibility for helping to move things forward.
>
> They should not perceive me as, in my words, a lone ranger or I referred to Mighty Mouse, here I come to save the day.  That was not something they could expect any outsider to do.  They knew the situations better than I did.  They knew where the potential problems

---

[26]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 434-35.

were.

I'm sure they had solutions and suggestions for those problems and that I looked forward to hearing from them. That I expected them to also . . . be honest, bring problems to my attention.

I was there to work myself out of a job. That my goal was to help create an organization where we exceeded customer expectations. That I expected them to follow the rules and regulations and any professional guidelines that applied to their areas.[27] *Under no circumstances would I allow anything less than doing things differently than they had in the past.*[28]

---

[27]With respect to the work performed by the R&V Division, the applicable professional standards are the *Uniform Guidelines on Employee Selection Procedures* ("*Uniform Guidelines*"), which have been described as follows:

The *Uniform Guidelines on Employee Selection Procedures* (1978) represent a joint statement of the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice as to the characteristics of acceptable selection procedures. . . .

. . . .

The *Uniform Guidelines* are not concerned, except with respect to record keeping, with selection programs that do not demonstrate adverse impact. For those selection programs that do have adverse impact, the options of the organization are specified. First, the organization may cease use of the selection device(s) under question and adopt other devices that do not result in adverse impact. If this is not acceptable, the organization may defend its practices [by demonstrating the validity of the selection procedure]. If validation evidence is used, it should specifically address the use of the selection instrument with all groups for whom the test is to be used. At a minimum this means that statistical validation should include a representative number of women and minorities. . . . A large portion of the *Uniform Guidelines* is in fact devoted to the steps, data, and procedures of validation strategies. An added provision, however is that the organization should demonstrate there are no other alternative selection programs that are both valid and have less adverse impact.

Robert D. Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION 51, 52 (5th ed. 2001).

[28]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 435-36 (emphasis supplied).

The Receiver thus instructed division managers that "business as usual" was no longer acceptable — in other words, that *change* was in order.[29]  The Receiver also asked each division manager to provide him with his or her division's operations manual.    Only Greg James, who had been head of the Employment and Administration Division, complied with that request.[30]  Although Dr. Seaman did not provide an operations manual for his division, he gave the Receiver a copy of a ***1977*** (*i.e.*, a twenty-five-year old) job analysis guide.[31]  The Receiver did not consider Dr. Seaman's submission to be responsive to his request, and told him that he needed to develop a standard operating procedures manual for the R&V Division, in view of the critical importance of Dr. Seaman's division to the development and administration of lawful employee selection procedures.[32]  *Three months later*, on October 7, 2002, when Dr. Seaman was placed on verbal notice that disciplinary action was contemplated, *he* still *had* not *provided the Receiver an operations manual for his division*.[33]

The Receiver again met with division managers, including Dr. Seaman, on July 10, 2002.  During this meeting, the Receiver shared concerns expressed by Board

---

[29]*Id.*
[30]*Id.* at 437.
[31]*Id.*
[32]*Id.*
[33]*Id.* at 438.

employees that the division managers seemed unwilling to make the changes necessary to reform the Board.[34]  Dr. Seaman responded by opining that the Receiver "did not understand" the situation, that the Board was understaffed, and that Dr. Seaman had been following directions.[35]  The Receiver explained that he was in the process of identifying critical issues, so that resources could be dedicated to resolve them.[36]  The Receiver also directed each division manager to complete assessments of themselves, as well as of all employees working within their respective divisions.[37]

The Receiver met individually with Dr. Seaman on July 17, 2002, to follow up on his directive that each division manager conduct a self-assessment and evaluation of all employees within his or her division.  Dr. Seaman presented the Receiver with a copy of a memorandum he had written to Acting Personnel Director Greg James[38] on *July 1, 2002 — i.e.,* a document that had *not* been generated in response to the Receiver's July 10th directive, but instead addressing the R&V Division's activities and Dr. Seaman's assessment of the division's staffing and resource needs.[39]  During the meeting, the Receiver raised concerns about employee morale within Dr.

---

[34]*Id.* at 439.

[35]*Id.*

[36]*Id.*

[37]*Id.* at 441.

[38]Mr. James served in an interim capacity during the gap between the resignation of Ben Payton as Personnel Director and the appointment of Dr. Sims as Receiver.

[39]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 444; *see also* Plaintiff's Ex. 13.

Seaman's division, ongoing use of selection procedures that did not comport with professional standards, inequitable work assignments, and test security issues.[40]   The Receiver also asked Dr. Seaman to describe his method of forecasting, but Dr. Seaman said that he did not forecast.   The Receiver found this troubling, and indicative of a lack of planning and organization.[41]   Dr. Seaman responded in a manner that became a constant refrain when he was challenged:  *he was understaffed* and *he was just doing what he had been told to do.*[42]   The Receiver told Dr. Seaman that his concerns were *not* based on *past events*, but instead were based on feedback from former "Consent Decree team"[43] members who recently had been reintegrated into the R&V Division.  The Receiver said:

> And I told him . . . whether their perceptions were correct or not, it was an issue that he needed to be concerned about and he needed to try to . . . address.  Because if they didn't have confidence in his ability to provide the leadership there, then we weren't going to be able to move forward in such a critical area.[44]

The Receiver and Dr. Seaman met again the following day, July 18, 2002, to discuss work assignments within the R&V Division.  The Receiver explained:

> My concern [was] about how jobs were being assigned, [and] not

---

[40]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 441-42.

[41]*Id.* at 442.

[42]*Id.* at 443.

[43]*See* text preceding note 17 *supra.*

[44]*Id.*

assigned.  I had — as I had done during my first weeks, I went around and continued to meet with employees to ask them about what they were working on.

I knew that with the people moving downstairs from the consent decree team that they were perceived as being much more competent than the people upstairs.  So I was looking to see what they were working on, what kind of assignments they had.

You know, part of what was coming up in my discussions with them is that *they weren't getting assignments.  They weren't doing things* except . . . sitting around, other than what time they were spending on the task force.

I explained to John [Seaman] that I was concerned about it.  How was he staying on top of it?  How was he — again, I think that's the first time I brought up the issue of kind of tracking the progress, forecasting. Again, this whole thing about *how you most effectively utilize the resources you have.  Because, again, in the past and even at that meeting he [talked] in terms of his being understaffed*.

I think, also, the day before as part of that, that July 17th meeting, he did give me a copy of the July 1st document that he had initially presented to Greg James, which was his assessment of his area, which laid out his staffing needs.

We talked about that again and my saying that, all right, you have these staff now . . . you told me you had a plan in place before they came downstairs, *how come these people aren't being utilized?  If it's so critical, if we are under so much pressure, then people should have multiple assignments now.  If these are your best people, then you need to get them to working.*[45]

The Receiver also discussed his concern about the continued use of Training and

---

[45]*Id.* at 443-45 (emphasis supplied).

Experience ("T & E") questionnaires, and T & E qualifying registers, as selection procedures, stating:

> As I looked in terms of the way that the T & Es were being used in the research and validation division, it was clear that it was nothing more than a ten-minute checklist of looking at the training, experience, and they also in some situations used TEQs or qualifications, and that wasn't an in-depth enough, you know, investigation of what was required to be able to actually assess or rate an applicant.[46]

Dr. Seaman responded that his continued use of such "quick-and-dirty" selection procedures was due to *a shortage of personnel*, and *he had been instructed to use those methods prior to the Receiver's appointment.*  The Receiver told Dr. Seaman that he could *not* continue to use the same "shortcuts" that had been employed prior to his appointment.  The Receiver also asked whether any registers of persons eligible for employment[47] had expired.  Dr. Seaman said "no."  Other events established that this response was, at best, disingenuous.

For example, in his July 1, 2002 memorandum to Greg James, Dr. Seaman had

---

[46]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 445.  *See also supra* note 16.

[47]Successful applicants for employment or promotion are placed by the Personnel Board on "registers of eligibles."  Once a register for a particular job classification has been established, a governmental entity served by the Board may request a "certificate of eligibles" when vacancies occur.  The certificate contains the names of the highest ranked candidates on the register who have indicated a desire to work for that particular employer.  The number of names certified to the appointing authority is a function of the number of vacancies to be filled.  Under the so-called "Rule of Ten," "[t]he director shall . . . certify to the appointing authority the ranking eligibles, correlating to the 10 highest test scores from the appropriate register, and if more than one vacancy is to be filled, the ranking names of the next highest test score for each available vacancy or all the names on the register if there are fewer than 10."  1994 Ala. Acts 564.

noted the R&V Division's very high priority of "prepar[ing] for, coordinat[ing] & administer[ing] Public Safety promotional & entry level testing *to replace aging registers*."[48]  During the evidentiary hearing, he further testified that "[w]e needed to devote, and particularly since *there had not been registers for several of these*, we had to — *we had to re-administer some of the public safety testing*."[49]  Additionally, just six weeks earlier, on May 15, 2002, Dr. Seaman had advised Greg James in another memorandum *of the need for a new register for the firefighter classification* for the City of Birmingham, stating, in pertinent part, that:

> Gordon Graham [the City's personnel director] contacted me today about the need for a new register of eligible candidates for Firefighter to meet current and impending staffing needs for the City of Birmingham.   The current register which has been purged is approximately 18 months old, and contains approximately 26-30 candidates who have already been certified to the city.

> Gordon informed me that it is perceived that the city will need to fill up to 40 vacancies; a level of hires that cannot be met using the current register.  He informed me that the city plans to employ (over strength) up to 25 Firefighters to accommodate the need for personnel in the absence of 20 incumbents who have been called up to active military duty, and that normal attrition will account for another 15 or more vacancies needing to be filled.[50]

Moreover, the Receiver attended a meeting in Washington, D.C., on July 23, 2002,

---

[48]Plaintiff's Ex. 13, at 2 (emphasis supplied).
[49]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 127 (emphasis supplied).
[50]Plaintiff's Ex. 11.

with counsel for some of the parties to the litigation and John G. Veres III, Ph. D., the court's special master.[51]  During that meeting, the parties advised the Receiver that certain *public safety registers had expired*, and that the Board should quickly take action to establish new registers.[52]

During the Washington meeting, the Receiver also spoke with Shane Pittman, Ph. D., an industrial/organizational psychologist who had served as a consultant to the Board since March of 2002, and the consultant the Receiver had asked to assess the work performed by Dr. Seaman's R&V Division.  According to the Receiver,

> [Dr. Pittman] expressed concern that [the R&V Division] still [was] taking shortcuts in testing.  That the procedures they were following were ones that, from her interaction with the parties, had already been communicated were unacceptable.  And at that point . . . she advised that I consider putting a halt to some of the exams that were scheduled, and that I needed to get somebody else to take a more in-depth look at the process.[53]

Upon the Receiver's return to Birmingham on July 24, 2002, he again asked Dr. Seaman whether any registers had expired, and, again, Dr. Seaman stated *there were no expired registers*.[54]

---

[51]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 446-47.  Prior to the Receiver's departure for the meeting, Dr. Seaman approached the Receiver and asked him to inquire of Dr. Veres whether, in certain cases, fewer than all of the components of a selection procedure could be administered.  The Receiver did so, and was advised by Dr. Veres that he previously had told Dr. Seaman that such a practice was not acceptable.  *Id.* at 448.

[52]*Id.* at 449-50.

[53]*Id.* at 453.

[54]*Id.* at 450.

During the evidentiary hearing, Dr. Seaman justified the incorrect information that he had provided the Receiver about public safety registers by claiming that he was not responsible for monitoring registers after they had been established. He said that after a register was created, and the period for appeals had elapsed, maintenance of the register was the responsibility of the Certification Division.[55]   He acknowledged, however, that he could have obtained the information requested by the Receiver.[56]  Even if monitoring the register was not Dr. Seaman's responsibility, he clearly knew, as early as May of 2002, that the firefighter register for the City of Birmingham was no longer viable.[57]

During August of 2002, the Receiver asked Greg James to conduct a review of the R&V Division.  James's report criticized Dr. Seaman's job performance, citing lengthy delays in establishing registers, failure to prioritize work assignments, excessive reliance on provisional appointments,[58] lack of an operational manual or standard procedures, and low staff morale.[59]  James based his conclusion upon a "close examination of Research and Validations [sic] Division assignment reports, Provisional Appointment reports, Personnel Board Annual and Semi-Annual Reports,

---

[55]*Id*. at 604-05.

[56]*Id.* at 605.

[57]*See* text accompanying note 50 *supra*.

[58]*See supra* note 15.

[59]Defendant's Ex. 61.

Board Minutes, and employee files and general complaints."[60]   The Receiver stated

that he considered the information contained in James' report merely as corroborating

information he gathered from other sources, and that the report did not form the sole

basis for Dr. Seaman's termination.[61]

The Receiver next met with Dr. Seaman on August 5, 2002, at which time he

reiterated his concern that Dr. Seaman had inequitably distributed the workload

among employees in the R&V Division.[62]   Additionally, the Receiver stated:

> In too many situations, [R&V Division employees] were talking
> about those that did have assignments, they weren't getting supervision.
> As I looked in terms of what people were doing, that there was still too
> much of an emphasis upon T & Es, and that I couldn't get my arms
> around exactly what was happening in terms of addressing the concerns
> we had in the testing area.[63]

The Receiver met with all employees of the R&V Division on August 30, 2002.

During the meeting, the Receiver expressed his dissatisfaction with the staff's failure

to adhere to professional standards for performing job analyses, and with the poor

quality of the division's work in general.[64]   He asked each employee to provide him

with a detailed description of his or her work assignments, the status of each

---

[60]*Id.*   No supporting documentation was attached to the report introduced into evidence
during the hearing before the magistrate judge, however.

[61]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 496.

[62]*Id.* at 453.

[63]*Id.* at 453-54.

[64]*Id.* at 454-55.

assignment, and a plan to complete each assignment.  He also told the staff that a

consultant, Lorren Oliver, had been retained to work with the R&V Division.  During

the meeting, Dr. Seaman complained that the Receiver did not understand test

development, and again told the Receiver that *the staff was doing what they had been*

*directed to do prior to the Receiver's appointment.*  The Receiver told the staff that

professional guidelines for test development were to be followed *without exception*,

and that "shortcuts" were unacceptable.  He stated:

> Again, I reminded everybody, to include [Dr. Seaman] at that point, that
> they were on notice that I had told them for the third, fourth, or fifth
> time that they were . . . not to do anything other than follow the rules
> and the professional guidelines in completing all their work.[65]

The message was not lost on Dr. Seaman, who stated that:  "Dr. Sims was very clear

in laying out his assessments of what he had perceived as going on in the testing

section and very critical of a lot of things that had transpired."[66]

Later in the day, the Receiver and Dr. Seaman met privately to discuss the

issues raised in the Division meeting.  The Receiver recounted their conversation as

follows:

> [Dr. Seaman yet again said] [t]hat I didn't understand . . .what was
> going on in terms of testing, all that was entailed.  That he was
> understaffed.  That he didn't have enough staff.

---

[65]*Id.* at 456.

[66]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 35.

> I explained to him that, as I looked at the work assignments and what people actually had on their plates, that he had more than enough staff. That even if he said some of the staff weren't competent, he had . . . the staff that were brought down from upstairs, and *that he needed to more effectively and efficiently use that staff.*

> He said . . . I've just been doing what I've been told. *And I told him, you were not told that by me. I've made it straight and clear from the day I got here what the rules are.*[67]

The Receiver told Dr. Seaman that he was on notice that his performance as R&V Division manager was deficient, and directed him to provide a detailed plan to address the Receiver's concerns.[68] Dr. Seaman testified:

> Later that evening, you know, I just told Dr. Sims, I stopped in his office and I told him, look, we had some things in progress, some of the very things he was talking about, they are on their way, and a goodly portion of the examinations were now being processed and would not move forward without the best practices effort, even though the consent decree group had not identified, even at that late juncture, an acceptable job analysis,[69] test development methodology that was supposed to be institutionalized throughout the whole agency.

> We still had some good idea how — you know, what the difference between more robust assessment approaches, and I informed him of that. From that point on, we were putting in place some of the very things that he was — which had already been in the process, but

---

[67]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 457 (emphasis supplied).

[68]*Id.*

[69]A "job analysis" is defined as "the gathering of information about a job in an organization. This information should describe the tasks or activities, the results (products or services), the equipment, material, and individuals, and the environment (working conditions, hazards, work schedule, etc.) that characterize the job." Robert D. Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION 18 (5th ed. 2001).

that he was upset about.[70]

Dr. Seaman provided the Receiver with two documents in an attempt to address the Receiver's criticism of his management of the R&V Division. The first, dated September 5, 2002, and entitled "Factors Historically Considered in Assigning Testing Projects to Staff," read as follows:

> For the most part, the factors I've considered when making assignments in the testing section have included:
>
>> -staff members' workloads
>>
>> -project difficulty (e.g., previous problems incurred for a class; scope of a project; potentially uncooperative SMEs[71]; timeframe in which register is desired; research and documentation needs)
>>
>> -staff members' prior experience with a class or job family
>>
>> -staff members' interest for given projects
>>
>> -staff members' ability to move projects forward efficiently
>>
>> -staff members' ability to work compatibly with SME personnel, exert the proper levels of control as needed necessary [sic] to stay on task (assertiveness, interpersonal skills; levels of confidence)
>>
>> -staff members' ability to follow instructions and carry them out efficiently
>>
>> -staff members' ability to work independently and to keep the

---

[70]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 37.

[71]Subject matter experts ("SMEs") are incumbents in the classification for which the selection procedure is being developed. *See* Gatewood & Feild, *supra* note 69, at 330-31.

supervisor informed of any problems, difficulties, needs, etc. that may arise

-staff members' written and oral communication skills

-staff members' work attendance records

-staff members' ability to accept responsibility for their work

Some efforts were made in the past to make testing project assignments based on staff members' identified strengths and interests, and in consideration of their area(s) of formal academic preparation. The attached sheet (Attachment 1) was used for a limited period of time in the 1990s to make such assignments. Whereas the numbers on the sheet are a bit out of alignment currently, they served at the time to indicate the primary and secondary occupational areas from which the Analysts' assignments were made. Due to the volume of work, the strategy subsequently was not maintained. Attempting to do so would have resulted in clearly inequitable workloads between the Analysts.

More recently, efforts were taken to make some assignments based on a recurring need for the registers, and problems persisting with the testing in place. Attachment 2 details some of these assignments. They were identified and assigned to the consent decree project work group at a time when they were no longer working on consent decree projects (i.e., the consent decree project work had been completed, the relevant reports had been submitted, and the decree team members were waiting for responses from the parties). Unfortunately, due to attorneys' concerns, all work on these projects was curtailed in somewhere near a month after the assignments had been made.

Finally, assignments have typically been made when the need for a register was determined upon receipt of a request for certification. Whereas some forecasting was done insofar as public safety testing programs (i.e., putting new registers in place approximately every 24 months) and some of the clerical positions, no systematic, forecasting

practices have been in place.[72]

The following day — *i.e.,* September 6, 2002 — Dr. Seaman again attempted to address the Receiver's concerns in a memorandum entitled "Practices and Timeframes Historically Marking Test Development Workflow," which read as follows:

> In the past we've followed various rules of thumb for moving forward with different types of projects. The projects typically proceeded by first obtaining SME input about the appropriateness of the job content information contained on the job class specs in defining the content of the jobs, and then moving on through a number of steps as shown in Attachment 1.[73] Inasmuch as several of the projects we pursued were accompanied by more stronger [sic] efforts in conducting job analysis inquiries, the job analysis procedures typically pursued left much to be desired toward suggesting that all relevant job tasks representative of the job task domain had been identified. This deficiency was the product of a formula where timeliness was prized over quality.
>
> *As of 09/05/02, when I met with the testing staff, pursuant to your concerns on 8/30/02, job analysis and test development activities will now be pursued in accordance with procedures outlined in Attachments 2 and 3.*[74]

---

[72]Defendant's Ex. 22. The exhibit does not contain the referenced attachments.

[73]Attachment 1, consisting of four pages, lists steps and the average number of days required to perform each step for "T&E Exam Development Timeframes," "Written Exam Development Timeframes," "Panel T&E Exam Development Timeframes (i.e., outside experts brought in to review/evaluate candidates following structured procedures)," and "Multi-Component/Assessment Center Type (Includes Behavioral Exercises) Exam Development Timeframes." Defendant's Ex. 38.

[74]Attachment 2, consisting of four pages, is entitled "Steps for Conducting Job Analyses & Developing Testing Procedures Consistent with the Provisions Set Forth in the [*Uniform Guidelines*]," and Attachment 3, consisting of one page, is entitled "Protocol for Conducting Small

I'm also in the process of putting together a work product tracking system which should go a long way to providing detailed information about the status of testing projects. It will be set up so as to allow staff to input information about the status of their projects, and to facilitate the availability of reports to track the work and evaluate the time taken to complete it.[75]

Notwithstanding the foregoing assurances, and despite the Receiver's very clear instructions, Dr. Seaman directed his staff to use "best practices" — *i.e.*, to comply with the *Uniform Guidelines* — only for *new* selection procedures: "For all of your current assignments for which draft announcements have not yet been sent out, and for all *new* assignments, please make note of the fact that job analysis, test development and documentation procedures consistent with the provisions set forth in the [*Uniform Guidelines*] must be employed and maintained."[76]

Prior to the appointment of the Receiver, and continuing thereafter, Dr. Seaman submitted weekly reports of his division's activities to Greg James, who had served as Acting Personnel Director following Ben Payton's retirement, and who was Interim Deputy Director during the period in which the events complained of

---

Group Job Analysis Procedures as Developed by John Hicks and Presented at the 23rd Annual [International Personnel Management Association Assessment Council] Conference in 1999." *Id.*

[75]Defendant's Ex. 38 (emphasis supplied).

[76]*See* Defendant's Ex. 19 (emphasis supplied). Dr. Seaman reiterated this approach in his response to the notice of contemplated disciplinary action: "I informed staff that I would assign to the returning [Consent Decree team] staff all new projects as requests for new registers were received. The new projects would require returning staff to apply to their new assignments the job analysis and test development technologies they had utilized in developing testing for the consent decree projects." Plaintiff's Ex. 2, at unnumbered page 7.

occurred.  The reports contained the following information:  the number of standard

testing assignments, standard assignments on hold, open-continuous assignments, and

open-until-filled assignments; a listing of director, department head, and division

manager vacancies; the number of provisional appointments; the number of registers

established during the week; and sections captioned "problems," "issues to monitor,"

and "other issues."  In view of the Receiver's concerns about the R&V Division,

following the August 30th meeting, the Receiver asked James to provide him with

copies of Dr. Seaman's weekly reports.  Accordingly, the Receiver reviewed Dr.

Seaman's reports for the weeks of September 1, 14, 23, and 29.[77]  The September 1st

report contains the following narrative under the heading "other issues":

> -based on concerns raised by Dr. Sims in a meeting on 8/30/02, for all
> current assignments that have not thus far entered the draft
> announcement phase, and for all new assignments, staff will be required
> to employ task analysis, KSA[78] development, test development and
> documentation procedures that are designed to be in accord with the
> provisions set forth under the [*Uniform Guidelines*] for demonstrating
> content validity.
>
> -I've recently been involved in discussions with testing staff on how
> best to revise the method for tracking the test development projects in
> the division; I'm in the process of putting together procedures through
> which the staff members themselves will be required to update
> electronic records that chart their progress on their test development

---

[77]Plaintiff's Exs. 17, 18, 19 & 21.

[78]"Knowledge, Skills, and Abilities."  "The term KSA is shorthand for the job-related factual
information and the ability to perform job activities possessed by the individual."  Gatewood &
Feild, *supra* note 69, at 4.

assignments, and through which reports on the status of the work can be readily obtained.[79]

In his September 14th report, Dr. Seaman made the following remarks in the sections captioned "problems," "issues to monitor," and "other issues," respectively:

[W]e will incur some delay in getting some standing projects out of the way; Lorren [Oliver] & I discussed what needs to be done in the division, & what I need to do in terms of evaluating the quality of projects before testing is given; thus, rather than going ahead & giving tests that are already in place or T & E assessments for approx 10 assignments which we're currently recruiting or recruitment has just closed, no testing will be done until valid procedures are judged to be in place; many of these projects will have to be reassigned (i.e., all were assigned to the staff in the division prior to the return of the 16th floor group [the "Consent Decree team"]); these delays incurred now will pay off in the future when effective testing procedures are in place.

[W]e're updating the manner in which testing projects are tracked in the division; the new application will allow Analysts to track and update the status of their projects, and facilitate the availability of reports indicating where projects are in their developmental stages, and dates upon which the necessary steps are completed[.]

[A]s of 9/13/02, we've closed out over 40% of the work projects we've been carrying on an open 'til filled (OTF) basis; we're awaiting responses to our efforts to close out a number of others at this time[.]

[T]he same efforts to close out OTF projects will also be directed to several of those currently carried on an open-continuous (OC) basis.[80]

Dr. Seaman's September 23rd report contained the following statements:

---

[79]Plaintiff's Ex. 17.
[80]Plaintiff's Ex. 18.

[I]n addition to the projects we've held up recently which were ready to close or had closed (applications are in hand), 4 new projects (2 with provisional appointments in place) need to be assigned, and a new request for 2 upper level IT [information technology] positions with the County came in Friday; based on my experience, we can expect new assignments will come in on an average of 1.5-3 a week; the difficulty of the workload is compounded by the fact that not all staff are at a level of capability that allows them to work independently.

[T]he new database to track testing projects is nearly in place; the staff will be shown how to use ACCESS database for updating their work and obtaining reports; the database facilitates obtaining reports about the general status of each project assigned, as well as detailed information about the status of each specific project

[E]fforts to close open-continuous (OC) assignments have resulted in 3-4 projects being closed, with some few additional ones expected to close; we will continue to monitor these (as well as open 'til filled projects — OTF) in order to close out as many as possible.[81]

On September 29th, Dr. Seaman reported the following under the headings of "issues to monitor," "other issues," and "concerns," respectively:

[W]e will continue to monitor OTF and OC assignments with the goal of closing as many down as possible.

[S]taffing necessary to deliver, across the board, valid testing programs in desirable periods of time is not in place; a review of the work shows that for the standard testing assignments listed above that are not on hold (i.e., 31 projects) 65% are just in the job analysis phase of the projects, with the remainder in test development or administration phases, or waiting for feedback on moving forward; in addition, another 7-10 new projects need to be assigned.

---

[81]Plaintiff's Ex. 19.

[L]ow staff morale; ratio of staffing to test development workload.[82]

The Receiver described the foregoing reports as "appropriate," but not informative.[83]

During the middle part of September of 2002, Andy Douglas, an employee assigned to the R&V Division, informed Dr. Seaman that he had discovered that Cynthia Dowe (another employee assigned to the R&V Division, and working under Dr. Seaman's supervision) had failed to assign a score to several employment applications for which she was responsible.[84]  Douglas suggested that Dr. Seaman advise the Receiver of the problem.[85]  Instead, Dr. Seaman asked Douglas to provide him with "more information," so that he could determine the best way to address the situation.[86]  According to Douglas, he provided the requested information, which Dr. Seaman accepted.[87]  Dr. Seaman said that he "had a folder on" Cynthia Dowe, and that there was nothing he could do about it.[88]

According to Douglas, after speaking with Dr. Seaman about the matter, he

---

[82]Plaintiff's Ex. 21.

[83]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 493.

[84]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 90; 185-86.

[85]*Id.* at 90.

[86]*Id.*

[87]*Id.* at 188.

[88]*Id.*

also told Greg James about the incident, without identifying the employee by name.[89]

James said "let's give John two weeks to talk to Dr. Sims about it," and told Douglas

not to tell Dr. Seaman about their conversation.[90]  Within the next day or two, James

told Douglas that he knew that the employee was Cynthia Dowe.[91]

On September 26, 2002, Greg James told the Receiver that Douglas had

informed him that Ms. Dowe had failed to score several applications.[92]  According to

the Receiver, James said that he had told Douglas to bring the matter to Dr. Seaman's

attention, and to tell Dr. Seaman that he needed to address the issue with the

Receiver.[93]  The Receiver talked to his assistant, April Hunter, who previously had

been assigned to the R&V Division, to verify the significance of failing to score

employment applications.[94]  The Receiver then spoke to Douglas, who confirmed that

he had brought the issue to Dr. Seaman's attention.[95]  Douglas told the Receiver that

Dr. Seaman's response was, "leave the past in the past."[96]  According to Douglas, the

Receiver was upset that Dr. Seaman had not told him about the unscored

---

[89]*Id.* at 189.

[90]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 211, 212.

[91]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 189.

[92]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 460.

[93]*Id.* at 461.

[94]*Id.*

[95]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 216.

[96]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 461.

applications.[97]

The Receiver testified that, shortly following his conversation with Douglas, he addressed the matter of unscored applications with Dr. Seaman, as well as the fact that Dr. Seaman had not brought it to his attention.[98]  Dr. Seaman told the Receiver the same thing he told Douglas:  he did not bring the matter to the Receiver because there was nothing he (Seaman) could do about it, and he intended to "leave the past in the past."[99]  The Receiver told Dr. Seaman:  "[Y]ou could do something about it. You could bring it to my attention.  We can figure out how we can somehow address the issue.  I can't deal with these things if I'm not aware of it, and this is serious."[100] The Receiver reassigned Dowe to another division on September 29th or 30th.[101]

Greg James recounted a slightly different version of these events.[102]  He testified that Andy Douglas spoke to him about the unscored applications, and that he directed Douglas to tell Dr. Seaman to make sure the applications were scored and to advise the Receiver of the situation.[103]  Douglas told him that Dr. Seaman was aware of the issue.  James testified as follows:

---

[97]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 216.

[98]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 463-64.

[99]*Id.* at 464.

[100]*Id.*

[101]*Id*. at 465.

[102]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 247-50.

[103]*Id.* at 248.

I thought that it would be a great opportunity for John to demonstrate that he was on board, that he was listening to the Receiver. That this is your area, you are — you are in charge, take charge, move forward, move aggressively, get things done right. And also to come forward and let the Receiver know what you've done. That's what I did. I gave John — I gave Andy an opportunity to get John to demonstrate that he — he was on board.[104]

During their second conversation about the unscored applications, James asked Douglas whether he had spoken to Dr. Seaman as James had suggested. Douglas responded that he had done so, but that Dr. Seaman had indicated that no further action would be taken.[105] James did not speak to Dr. Seaman about the applications, but told the Receiver about the discovery that some applications had not been scored.[106]

Dr. Seaman testified about these events as well.[107] He acknowledged that Andy Douglas informed him that he had discovered that Cynthia Dowe had failed to score a number of applications, and that Douglas said he believed the matter should be brought to the Receiver's attention.[108] Dr. Seaman told Douglas that he previously had experienced problems with Cynthia Dowe, and asked Douglas to provide him

---

[104]*Id.* at 269-70.

[105]*Id.* at 249.

[106]*Id.* at 249-50.

[107]Doc. no. 6 (transcript of hearing, Feb. 27, 2003) at 90-92.

[108]*Id.* at 90.

with additional information.[109]  Dr. Seaman testified that Douglas did not provide the

requested information.[110]  He further testified that he did not advise the Receiver of

the problem, and that the Receiver did not speak to him about the issue.[111]

Beginning in early September of 2002, the Receiver asked Lorren Oliver —

who at the time served as a consultant to the Board,[112] but who now serves as the

Board's Deputy Director — to assess the R&V Division's procedures.[113]  According

to Oliver, the Receiver wanted to ensure that the work performed in the R&V

Division comported with professional standards and was legally defensible.[114]  In

order to conduct the assessment, on September 6, 2002, Oliver, through the

Receiver's Executive Assistant April Hunter, requested that Dr. Seaman provide

documents and information, including:  a full accounting of all testing procedures

utilized by the R&V Division; his assessment of the current status of projects; a copy

of existing job analysis and test development protocols used by the R&V Division;

a review of the "open until filled" classifications; and a copy of a certification request

---

[109]*Id.* at 90-91.

[110]*Id.* at 91.

[111]*Id.* at 90-91.

[112]Oliver initially was retained to review proposals for development of the police and deputy
sheriff sergeant promotional selection procedure. Doc. no. 7 (transcript of hearing, Mar. 12, 2003),
at 325.  Oliver accepted a position as Deputy Director of the Personnel Board during October of
2002. *Id*. at 379.

[113]*Id.* at 325.

[114]*Id.* at 327.

for a senior social worker position and the rationale for posting the position.  Dr.

Seaman provided the following response:

1.  Full accounting of all testing procedures assigned in Research and Validation under your supervision.  Your documentation should include an assessment of the current status on projects.

I spoke with Lorren last week about this in terms of the database structure we were working to get into place to provide the level of detail needed to properly track the work.  I met with each Analyst, and subsequently updated records for their assignments according to the criteria in place to provide the greater detail desired.  At this point, we have the database, we have a form for Lorren's review insofar as what data can now be in put for a testing assignment, but we have not had the time yet to build the report structure (or various types of structures we may wish to have in place); what I am trying to put together is a file to e-mail to Lorren which provides status information about each assignment (non open continuous or open 'til filled), but it will not be in the form of a report, but rather a copy of each record as it is currently reflected [in] the new database we've built.  If I can't get this into place, <u>I'll present you with a hard copy to fax</u>.

2.  An outline of the proposed methodology for the CEO position at Cooper Green Hospital.

I plan to present this to Lorren in the morning.  I regret that I didn't know this and the other information desired would be needed prior to my meeting with him.

3.  Copies of the certification request for the position of CEO at Cooper Green Hospital.

Attached is the letter confirming receipt of the CEO certification.  I do not have a copy of the actual certification request submitted.  I will contact the E/A [Employment Administration] Division to

get a copy for Lorren.

4.  A copy of existing job analysis and test development protocol used by Research and Validation.

> Two copies are attached.  One is a detailed list of steps which, while all would not necessarily be appropriate for any given project, identify key elements that need to be taken to establish content validity of the procedures.  The other attachment identifies the broad steps followed by the consent decree team in working on those projects.

5.  A review of the current Open till [sic] filled positions with clear indications with [sic] positions that should be closed at this time.

> The review was completed over the past 2 days.  We will be closing this Friday (9/13/02) approximately 13 of the 27 projects that have been carried on an open 'til filled basis.  We will then direct our attention to following-up on the  remaining ones that likely can be closed, and move accordingly to close them.  For those we feel should be left open based on specific considerations, we'll certainly solicit Lorren's input on the issue.

> We have also reassigned several open-continuous projects in order to more equitably distribute them among the staff now that members of the 16th floor group have rejoined the 1st floor group.  The next step with these will be the same as done, and continuing to be done for the open 'til filled; that is, the necessary contacts will be made to determine the appropriateness of closing down as many of the open continuous projects as possible.

6.  The certification request from the agency on the Senior Social Worker position.

> Attached is the letter confirming receipt of the Senior Social Worker certification.   I do not have a copy of the actual certification request submitted.  I will contact the E/A Division to

get a copy for Lorren.

7. The rationale for the job posting of the Senior Social Worker position.

> We posted the Senior Social Worker announcement because there were only approximately 4 eligible candidates on the register, and neither one of the two eligibles indicating interest in working for the Jefferson Rehabilitation and Health Center would accept work there when it offered to them.[115]

On September 10, 2002, April Hunter requested from each staff member of the R&V Division information on each classification for which testing was scheduled during the months of September or October of 2002. In particular, Hunter asked the staff to provide the announcement date, number of eligible candidates, the date of testing, and the type of selection procedure to be used.

Oliver requested additional information from Dr. Seaman, again through April Hunter, on September 11, 2002: a list of the classifications "released" from the consent decree;[116] the number of incumbents in each position; the number of

---

[115]Defendant's Ex. 37.

[116]In the context in which it is used here, the term "released" is understood to mean that the parties to *United States v. Jefferson County*, No. CV-75-S-666-S, have agreed that the selection procedure satisfied paragraph 12 of the Personnel Board's 1995 Modification Order, which states:

> It shall be the Personnel Board's responsibility to establish that each selection procedure required or used by the Personnel Board, including each standard (including minimum qualifications used to determine which applicants are qualified or eligible to apply for a job or submit to a selection device), procedure, test or other device, shall either (1) have no adverse impact on the basis of race or sex, as defined by the Uniform Guidelines on Employee Selection Procedure, 29 C.F.R. § 1607 et seq. (1994), (hereinafter "the Uniform Guidelines"); or (2) be job related for the job

certification requests; the number of provisional appointments; a review of the selection procedures used for each classification and issues that must be addressed before the next administration; action that has been taken to address the identified issues for each position; and information regarding certification requests for the positions.[117]  Dr. Seaman responded as follows:

> 1. A list of the positions that have been released, number of incumbents in each position, number of certification requests and number of provisional appointments
>
>> We have the information noted above (see attached list), with the exception of the information regarding # of certifications and provisionals which is being compiled by the Employment Administration Division.  I expect to have it later this afternoon.  I've done everything I could to expedite meeting Lorren's information needs [NOTE — certification & provisional

---

classification(s) in question and consistent with business necessity, in accordance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Uniform Guidelines and other applicable Federal law.  If a selection procedure or combination of selection procedures is used by the Personnel Board to rank candidates, the parties and the Court will consider the candidates' relative ranking and the actual effect of that ranking in determining whether the procedure has adverse impact for that use.  In accordance with the Uniform Guidelines, where there exists adverse impact in a selection procedure, as part of its consideration of the job relatedness and validity of any selection procedure, the Personnel Board shall conduct a reasonable investigation of suitable alternative selection procedures and explore suitable alternative methods of using the selection procedures which have less adverse impact.  Whenever the Personnel Board, a jurisdiction served by the Personnel Board, or any party identifies a race-neutral selection procedure that has less adverse impact than a selection procedure required by the Personnel Board and that alternative procedure is also agreed by the parties to be job related for the job classification in question and consistent with business necessity and in accordance with applicable law, such alternative selection procedure shall be used by the Personnel Board, absent good cause shown. [Footnote omitted.]

[117]Defendant's Ex. 41.

appointment information was obtained, but not for Public Safety classes released under the decree].

2.  A review of the selection procedures used for each position and issues that must be addressed before the next administration.

The only classes released which were accompanied by concerns by the parties insofar as future uses of the test were Fire Apparatus Operator and Police/Sheriff's Sergeant. Dr. Pittman is looking at these. In the case of the Apparatus Operator class, the question is whether or not we need to have in place a performance driving test, vs. requiring qualified applicants to possess FAO I (Fire Apparatus Operator Level I) credentials which they obtain through local training/testing in their jurisdictions. For P/S Sgt, a new test must be developed.

Insofar as our own internal review of the outcomes of the projects released for which the parties raised no objections, we have not pursued such activities where no certification request is in place for these classes.

3.  Action that has been taken to address the issues for each position.

As noted above, Dr. Pittman is consulting with the Board regarding the public safety positions for which testing developed under the decree was released.

4.  Information regarding certification requests for the positions (are there positions that need to be announced or have been announced that are Consent Decree positions, but have been released by the parties?).

We have certification requests on hand for Gardener, Senior Social Worker and Traffic Maintenance Worker, all which were classes under the decree for which testing was developed, administered and the associated registers released. I am currently reviewing the Gardener validity report (Pittman Project); we are currently recruiting applicants for Senior Social Worker (Pittman

Project; less than 10 applications received thus far) and will need to make a decision on closing down, testing, and reopening later if staffing need cannot be met, or some other approach; Traffic Maintenance Worker was scheduled for testing 9/16/02, but the testing date has been cancelled to allow for ensuring the adequacy of the testing instruments.[118]

Oliver solicited, and received, a status report of each project from each employee.[119]  Oliver described the reports as follows:  "Essentially, what I received was a kind of hodgepodge of listings of positions, dates of certain . . . activities.  But very little in terms of any kind of evaluative information that would provide at least some feedback on the adequacy of the various stages of the work that had been done."[120]  Additionally, Oliver met with Dr. Seaman, Libby Miller, Barbara Lee, Kathleen Tevis, and Barry Jackson.[121]  Oliver formed the following impressions based upon the meetings with R&V Division staff:

> There were a number of interesting things that surfaced in these meetings.  First of all, the night before this meeting I did receive a job announcements report for Kathleen Tevis, and I had an opportunity to review that work product and had extensive discussions with her about the product.
>
> I did have a chance to meet with [Dr. Seaman] and talk with him about, essentially, what I sensed was a sparsity of information that was

---

[118]Defendant's Ex. 42.

[119]*See* Defendant's Exs. 23-35.

[120]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 332.

[121]*Id.* at 333; *see also* Defendant's Ex. 46.  Becky Maze did not appear for her scheduled meeting.  Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 333.

available in terms of the status of projects. And John indicated he was in the process of trying to work through a system to do that.

But what I needed was to be able to very quickly, you know, from the perspective of someone who is, in fact, supervising the projects, and get a clear read as to where things were at that point in time.

My concern level was somewhat elevated, particularly having looked at the quality of the limited work products that I had at that point been able to review, especially as it relates to traffic maintenance worker.

The other thing that I noted in the meetings was that there was an apparent — and particularly in the meeting with Kathleen Tevis, an apparent disconnect in the supervisory process, because she seemed somewhat surprised that I would have expected her work product to be reviewed by the division manager.

I also discovered that the division manager had not, in fact, reviewed the work product. And the test, at the time we were having the meeting, was, in fact, days away from the administration of what was a second component in the testing process.[122]

Based upon Oliver's review of the traffic maintenance worker validation report,[123]

and because of what he perceived to be serious deficiencies in the selection

procedure, he recommended to the Receiver that the test administration scheduled for

September 16, 2002 be cancelled. The Receiver followed his advice.[124] Oliver asked

---

[122]*Id.* at 333-35.

[123]Following administration of a selection procedure, professional practice dictates that a validation report be prepared, documenting the development, administration, and results of a selection procedure. "The purpose of validation is to provide evidence that data from the selection instruments are related to job performance." Robert Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION 21 (5th ed. 2001).

[124]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 335.

Dr. Seaman to review the validation report. Dr. Seaman did so, identified a number of deficiencies, and concluded (as had Oliver) that additional work was necessary to satisfy professional standards.[125]

Oliver also asked Dr. Seaman to provide an assessment of his present staff, and Dr. Seaman submitted a report providing his evaluation of each employee's skills in the areas of: "functional skills in using word-processing, database management, or statistical analysis software"; "verbal and written expressive skills sufficient to support the proper degree of analytical inquiry and written documentation needed when conducting job analysis research, working with [subject matter experts] or preparing test materials or test validation reports"; and "understanding the concept of validity, and of how the various steps taken to develop valid testing under a content validation strategy are related to determining, assigning, and ranking test scores."[126] Dr. Seaman assigned scores of "-1" to represent "below average," "0" to represent "average," and "+1" to represent "above average." Oliver considered the information in conjunction with the status report submitted by each staff member indicating the number of assignments for which he or she was responsible. He concluded:

---

[125]Defendant's Ex. 49.
[126]Defendant's Ex. 48.

*[T]here was significant variability in the volume and assignment load* that is evident in the — there are *some individuals* here who are analysts who [were] *assigned as few as one or two projects, and* there [were] *some that were assigned . . . in excess of twenty projects.*

*But what was strange was that*, when I looked at John Seaman's evaluation of the levels of functioning of the staff relative to the assignment level, *there was some significant inconsistency there.*

For example, *I noted that individuals who had been, based on Mr. Seaman's assessment, deemed to be deficient in performance* — and to give examples, B. Maze is uniformly rated at negative one, which translates to below average in functional skills, database management, written, verbal, expressive skills, analytical skills, below average in terms of understanding of concepts of validity, and some of the areas of knowledge germane to testing, *had quite a significant load in terms of assignments.*

*I noted on the other side of the continuum were individuals*, like [L.] Miller, who based on the assessment here, reflect ratings at a plus one level, which translates to being above average on those same dimensions I just mentioned, *had two projects assigned.*

So, *I was curious as to why there was this evident degree of inconsistency between levels of assessment in terms of judgments of competence and ability to perform and actual work assignments.*[127]

Following Oliver's review of the foregoing, he was concerned about the lack of information on the status of projects, and the fact that no tracking system was in place. Oliver testified that he also reviewed the selection procedure for the Fire Chief classification.[128] He learned from the analyst responsible for the project that the oral

---

[127]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 338-39 (emphasis supplied).
[128]*Id.* at 372-73.

board component of the selection procedure had been purchased, rather than developed by Board staff or consultants retained by the Board.  When Oliver asked the analyst for the basis supporting use of the test, the analyst told Oliver that he had spoken to the vendor by telephone and concluded the test would be appropriate. Oliver asked the analyst whether a "transportability" study had been conducted — *i.e.*, a study that establishes the relationship between the selection procedure sought to be used and the areas to be tested as determined by the job analysis — and he was informed that no such study had been undertaken.[129]   Accordingly, Oliver recommended that administration of the oral board component be postponed pending further review.[130]

Oliver also was concerned about the R&V Division's lack of standardized test development procedures.  Oliver reviewed the September 6, 2002 memorandum that Dr. Seaman had provided to the Receiver, including "Attachment 2," which listed "Steps for Conducting Job Analyses & Developing Testing Procedures Consistent with the Provisions Set Forth in the [*Uniform Guidelines*]."[131]  Oliver described the outline contained in "Attachment 2" as follows:  "essentially what this would be is

---

[129]*Id.* at 373.

[130]*Id.*.

[131]Defendant's Ex. 38.

perhaps a list of ingredients to bake a cake but with no sense of how to bake it."[132]

He explained why it is inadequate simply to instruct staff to "follow the *Uniform Guidelines*":

> Because it is important for you to really translate that to work practices.  You can say, okay, a job analysis is necessary, fine.  What does that mean?  What steps need to be taken?  What critical criteria guide the decision points that need to be made.
>
> When you look at ratings for a particular position, how do you determine what you should be focused on in that testing process?  How do you determine what kinds of instruments you are to be utilizing?  So it's not simply what component, it is a how-to aspect of it that is important to translate.
>
> Particularly, when you have multiple individuals working in a division, it's important that someone provide supervision of the work, you know, establish standards, guides and directs the work that is taking place, models the appropriate types of things, and also monitors the work that is ongoing to be sure that, at the end of the day, there are standards that are clear, that are consistent with professional practices, that permeate the work that is done, and that ultimately places the Personnel Board of Jefferson County in a place of competence in terms of testing programs that are in place.[133]

With respect to Dr. Seaman's failure to track the work of the R&V Division, Oliver testified as follows:

> I did, you know, express to him my concern that given the sheer volume and complexity of testing activities that the Board is responsible for, that it is strange that there is no mechanism involved.  And his

---

[132]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 369.

[133]*Id.* at 362-63.

response surprised me because what [Dr. Seaman] conveyed was his overall philosophy, that *the focus of work was not so much on the quality of it but more* we had to get it out, *get the job out.*[134]

Oliver acknowledged that Dr. Seaman had told him that he was in the process of *developing* a tracking system, and recounted the following:

> I recall [Dr. Seaman] raising the tracking issue.  In a sequence of a conversation that we were talking about, what other positions within the system were, at this point in time, scheduled for administration that we needed to — and he started talking about the tracking system.  An external difficulty I had, quite frankly, was, based on what I had seen to that point, it was clear that there were some problem devices that were about to be [administered].
>
> . . . .
>
> I had seen that based on my observations.  At that point, I had not seen tracking, but I had seen some other classifications.  It was pretty clear that there were some consistent deficiencies in the work.
>
> What we needed at that point was to find out what other positions were scheduled for testing, and Mr. Seaman wanted to engage me in terms of a review of the tracking system.  I shared with him candidly that what we needed to do first and foremost was to do some damage control in terms of the positions that were about to be released to incur additional liabilities for the Board.
>
> My rationale for that simply is this, you know, I think you may be aware that the Board has had some major issues with testing.  We have indications of a fire and what I'm looking at is a sprinkler plan.  And it's at this point in time a little bit late in the process.
>
> We needed, first of all, to get our hands around what's about to be

---

[134]*Id.* at 392 (emphasis supplied).

tested.  So that we can act, in the case, for example, as we did for traffic maintenance worker, make some appropriate decisions.[135]

According to a document prepared by Dr. Seaman, there were, as of September 23, 2002, eleven classifications for which administration of the selection procedure was scheduled for either September or October of 2002, but which were placed on hold by the Receiver for review.[136]

On September 30, 2002, Oliver sent an electronic mail message to the Receiver, which read as follows:

> *The information shared with me this morning regarding the most recent anomaly uncovered in the R&V Division can only be characterized as gross negligence on the part of the R&V Manager.*[137] Based on my conversation with April [Hunter, the Receiver's executive assistant], it is my understanding that a number of cases, dating as far back as 1995, have been identified where no ratings were conducted for legitimate applicants for positions posted by the board.  Further, this practice operated with the full knowledge of the R&V Manager.  This is a serious situation, because due to the negligence of the Division Manager, applicants were denied the opportunity to compete for positions for which they had applied.  This situation is just one additional indicator of the significant problems with the current supervision of the R&V function.
>
> In a less than comprehensive review of the Research & Validation Division's operation, a number of irregularities have surfaced that are indicative of poor management and supervision.  Over the past few weeks, I have had the opportunity to make observations of the

---

[135]*Id.* at 415-16.

[136]Defendant's Ex. 52.

[137]This statement presumably refers to the discovery of the unscored applications.

functioning of the R&V Division.  Based on my observations, *I have very serious concerns about the current manager's ability to structure very basic systems, policy and procedures required for a large scale testing operation and even more grave concerns about his ability to train, guide, direct, coach and mentor subordinates to the successful development and implementation of JCPB testing programs.*  There is tremendous variability in the work practices occurring under his supervision and too often these varied, non-standardized approaches to the work violate basic good professional practice for a testing function. *The Manager has developed virtually no policy, procedures, or basic work guidelines for the division, after over a decade serving in the capacity as a supervisor for this critical function.*  Further test security measures to protect the integrity of the division's testing activities are virtually non-existent.

The current division manager's supervisory approach vacillates from a clear abandonment of basic supervisory/managerial responsibilities to active participation in the division's dysfunctional [sic].  The manager often appears to have no knowledge of the quality of job analysis and test development activities under his supervision. He admittedly had not conducted basic technical reviews of this work. Interestingly, his staff appeared to be equally surprised by the suggestion that they should have technical work reviewed by the manager.

*The combination of ill prepared technical personnel and poor management and supervision of the testing function is a dangerous prescription for serious problems.*  The Board must move to address this situation and to provide competent leadership and supervision of the R&V Division.[138]

Oliver did not discuss the substance of the electronic mail message with Dr. Seaman.

During the evidentiary hearing, the Receiver explained why he decided to

---

[138]Defendant's Ex. 77 (emphasis supplied).

initiate disciplinary action against Dr. Seaman:

> It goes back in terms of overall, I would say, neglect of duty. His failure on a number of occasions to bring problems, issues to my attention that I had informed him that he had a responsibility to do so. He was not . . . equitably making work assignments to employees which contributed to . . . what was already low morale and continued to get worse.
>
> Overall, as time was going, I had serious doubts about his ability to be able to provide the leadership that was needed in the research and validation area that would allow me to fulfill the charges that I accepted as the receiver.[139]

On October 7, 2002, the Receiver verbally advised Dr. Seaman that he was contemplating taking disciplinary action against him, and provided Seaman forty-eight hours within which to resign, failing which the Receiver would proceed with disciplinary action.[140] The Receiver placed Dr. Seaman on administrative leave with pay.[141] Dr. Seaman did not tender his resignation on October 9, 2002.

The Receiver issued a "Notice to Employee of Contemplated Disciplinary Action" on December 31, 2002.[142] The notice advised Dr. Seaman that disciplinary action, including termination, was contemplated against him for violation of Personnel Board rules relating to incompetency or inefficiency, neglect of duty, and

---

[139]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 466.

[140]*Id.*

[141]*Id.* at 467.

[142]It is unclear why the notice of contemplated disciplinary action was not issued until more than two months after Dr. Seaman was placed on administrative leave.

other reasons deemed to be in the best interest of the public service.  The Receiver

cited four grounds for the contemplated disciplinary action:

1.    Analysis of the work assignments for the former Research and
      Validation (R&V) Division's staff (Personnel Analyst I,
      Personnel Analyst II, Personnel Analyst III, and Personnel
      Specialist) over the past three years indicated your failure to plan,
      develop and implement a strategy to produce valid selection
      (examination) devices in a timely and professionally sound
      manner.  The average length of time used for creating a register
      was unreasonably long.  In addition, several registers (Chief
      Court Clerk and Minute Clerk) remained assigned but not
      completed for over two years.

2.    Review of the R&V assignment register also revealed the
      distribution of assignments among your staff to have been
      unreasonable.  Such assignment distribution indicates a pattern of
      giving the majority of assignments to one or two Personnel
      Analysts (Cynthia Dowe and Barbara Lee) while other Personnel
      Analysts were given only a few.  This method of distributing
      assignments was unfair and created morale problems within the
      Division.

3.    Examination of the operations within the Division also indicated
      your failure to forecast demand for creation of new registers and
      take proactive measures to meet the demand when it accrued.
      Further observation of the R&V operations also revealed your
      failure to establish an effective method for tracking and
      evaluating the work product of your staff.  On several occasions,
      you admitted that little or no job analysis was conducted for many
      examinations because it was more important to "just get
      something out."

4.    You also, for an extended period of time, failed to take
      appropriate corrective measures when it was brought to your
      attention that one of your staff members (Cynthia Dowe) had

failed to score all applications for several registers. Many of those applications remained unscored at the time you were placed on administrative leave. When you were told to bring this matter to my attention, you refused to do so, even though you knew that it was not in the Board's best interest to ignore the problem.

I have also preliminarily concluded, based upon observations after I became Receiver of your work performance, attitude, and approach to leadership and management, that it would not be in the best interest of the Jefferson County Personnel Board, and would not be consistent with the court-ordered institutional reform which I have been appointed to achieve, for your employment as Personnel Manager, Research and Validation Division, to continue.[143]

The Receiver provided Dr. Seaman an opportunity to respond in writing, and orally, by January 8, 2003. Dr. Seaman submitted a lengthy written response to the charges.[144]

On January 15, 2003, the Receiver notified Dr. Seaman that he had reviewed his response to the charges, and had decided that his employment would be terminated effective January 16, 2003. In the notice, the Receiver stated that he found Dr. Seaman in violation of Personnel Board Rule 6.2(h) relating to incompetency or inefficiency, Rule 6.2(k) relating to neglect of duty, and 6.2(p) providing that a merit system employee may be disciplined for any other reasons deemed to be in the best

---

[143]Doc. no. 1 (Request for a Due Process Hearing and Notice of Appeal of Disciplinary Action).

[144]*Id.*

58

interest of the public service and not in contradiction of any rules and regulations.[145]

The Receiver reiterated the bases of that conclusion as follows:

1.      You failed to plan, develop, and implement a strategy to produce valid selection (examination) devices in a timely and professionally sound manner.  In addition, several registers remained assigned but not completed for over two years.

2.      You did not distribute work assignments among your staff reasonably and fairly which caused morale problems within the Research and Validation Division.

3.      You failed to establish an effective method for tracking and evaluating the work product of your staff.  In addition, you failed to forecast for creation of new registers and to take proactive measures to meet demand when it accrued.

4.      You failed to take corrective measures when it was brought to your attention that one of your staff members, for months, had failed to score all applications even though the registers had been established.  When  you were told to inform the Receiver of the problem, you refused to do so.[146]

### III. DISCUSSION

As discussed in Part I of this opinion, Dr. Seaman objected to this court's *de novo* review of the magistrate judge's report and recommendation.  For the reasons stated in Part I, that objection is overruled.

The Receiver's objections take issue with the findings of the magistrate judge

---

[145]Defendant's Ex. 65.

[146]*Id.*

59

with respect to each of the Receiver's grounds for terminating Dr. Seaman's employment.

**A.     Charge No. 1:  Failure to plan, develop, and implement a strategy to produce valid selection (examination) devices in a timely and professionally sound manner.   In addition, several registers remained assigned but not completed for over two years.**

The Receiver objects to the magistrate judge's findings, asserting that the magistrate erred by assuming that the Receiver expected Dr. Seaman to *develop* valid selection procedures during a thirty-day period, and, by relying on the pre-Receivership "Strategic Plan" to justify Dr. Seaman's actions.  The court finds the Receiver's objections to be well taken.

The magistrate judge's conclusions with respect to the first charge conflict with the evidence.  At the outset, the court observes that, despite the clear language of the charge, the magistrate judge characterized its "essence" as Dr. Seaman's failure "*to produce valid examinations using uniform guidelines* [sic] *in a timely manner*,"[147] rather than his failure *to plan, develop and implement a strategy* to do so.  Additionally, the magistrate judge's characterization of the charge conflicts with the Receiver's testimony that he expected Dr. Seaman "to *plan, develop and implement parts* of *a strategy* [to produce valid selection procedures] within thirty days."[148]

---

[147]Doc. no. 9 (Report and Recommendation) at 89.

[148]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 479 (emphasis supplied).

60

The magistrate judge also incorrectly focused on events occurring *before*, and instructions given to Dr. Seaman *prior to, this court's imposition of the Receivership*. In particular, the magistrate judge concluded that Dr. Seaman's continued reliance on the directions of the Personnel Director who preceded the Receiver (Ben Payton) to use "expedient," rather than professionally acceptable, selection procedures — directions given under the so-called "Strategic Plan" developed by the Board nearly two years prior to imposition of the receivership — was reasonable. The magistrate judge also faulted the Receiver and Lorren Oliver for being unaware of those directions!

Despite the testimony of Dr. Seaman and former Personnel Director Ben Payton to the contrary — testimony which was accepted by the magistrate judge as true — *the Strategic Plan was not approved by this court*. As discussed above,[149] a copy of the plan was provided to the court *for informational purposes* shortly before the commencement of the recorded status conference conducted in November of 2000,[150] *but the Board neither sought, nor obtained, court approval of the so-called "Strategic Plan*." Even if that plan had been approved by the court, the plan implemented by the Board[151] during November of 2000 had no relevance whatsoever

---

[149]*See* text accompanying note 18 *supra*.

[150]*See* doc. no. 707 in Civil Action No. CV-75-S-666-S.

[151]In his discussion of the second ground for Dr. Seaman's dismissal, the magistrate judge

to the Receiver's decision to initiate disciplinary action against Dr. Seaman in October of 2002.  To the extent that the magistrate judge believed that the backlog of work that may have been created by the partitioning of R&V Division in December of 2000 somehow excused Dr. Seaman's failure to plan, develop, and implement a strategy to produce lawful selection procedures, this court cannot agree that substitution of the Receiver's judgment is justified by this record.

The evidence adduced at the hearing establishes, unequivocally, that Dr. Seaman had no method of forecasting, or otherwise planning for staffing needs attendant to the creation of new registers of persons eligible for employment to the hundreds of job classifications within the merit system.  He admitted as much in his September 5th memorandum to the Receiver, in which he stated:

> [A]ssignments have typically been made when the need for a register was determined upon receipt of a request for certification.  Whereas some forecasting was done insofar as public safety testing programs (i.e., putting new registers in place approximately every 24 months) and some of the clerical positions, *no systematic, forecasting practices have been in place.*[152]

Moreover, Dr. Seaman had no procedural manual, nor even standard operating procedures in place, for his division.  Following the August 30th meeting of the

erroneously stated that the expedient methods approved by the Board as part of the Strategic Plan "had the blessing of the *Jefferson County Commission,*" a public entity separate from, and with *no control* over, *the Jefferson County Personnel Board.*  Doc. no. 9 (Report and Recommendation), at 104 (emphasis supplied).

[152]Defendant's Ex. 22 (emphasis supplied).

Receiver with employees of the R&V Division, during which the Receiver was highly critical of the division's performance, Dr. Seaman's effort to describe to the Receiver the methodology historically utilized by his division to develop selection procedures was vague, but nevertheless explains why the underlying class action lawsuits have perversely persisted for more than three decades:

> In the past we've followed various *rules of thumb* for moving forward with different types of projects.   The projects typically proceeded by first obtaining SME input about the appropriateness of the job content information contained on the job class specs in defining the content of the jobs, and then moving on through a number of steps as shown in Attachment 1.  Inasmuch as several of the projects we pursued were accompanied by more stronger [sic] efforts in conducting job analysis inquiries, *the job analysis procedures typically pursued left much to be desired toward suggesting that all relevant job tasks representative of the job task domain had been identified.   This deficiency was the product of a formula where timeliness was prized over quality.*[153]

Despite his admission of the deficiencies of the work produced by the division he had supervised for ten years or more, Dr. Seaman's plan for developing new selection procedures, that complied with all applicable federal standards, was presented to the Receiver in no more than outline form.[154]   As Lorren Oliver aptly observed, "essentially what [Dr. Seaman's submission] would be is perhaps a list of ingredients

---

[153]Defendant's Ex. 38 (emphasis supplied).
[154]*Id.*, Attachments 2 & 3.

to bake a cake but with no sense of how to bake it."[155]  In short, this record establishes no valid basis for questioning the Receiver's conclusion that Dr. Seaman had woefully "fail[ed] to plan, develop, and implement a strategy to produce valid selection (examination) devices in a timely *and professionally sound manner*."

Additionally, the Receiver's determination that Dr. Seaman failed to plan, develop, and implement *a strategy* to produce valid ("professionally sound") selection procedures is supported by Lorren Oliver's report.  Oliver's report followed a review of documentation provided by Dr. Seaman and R&V Division staff, as well as personal meetings.  Based on the foregoing, Oliver concluded:

> There is tremendous variability in the work practices occurring under [Dr. Seaman's] supervision and too often these varied, non-standardized approaches to the work violate basic good professional practice for a testing function.  [Dr. Seaman] has developed virtually no policy, procedures, or basic work guidelines for the division, after over a decade serving in the capacity as a supervisor for this critical function.[156]

The reports submitted by Dr. Seaman to Greg James during the month of September of 2002, which the Receiver reviewed, indicate the number of registers[157] that were established each week.  The reports provide no meaningful information

---

[155]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 369.

[156]Defendant's Ex. 77.  The magistrate judge was concerned that Oliver did not tell Seaman that he was asked by the Receiver to assess the division, but the significance of such an omission is unclear.  It likely was apparent to Dr. Seaman, or at least should have been, based on the information requested by Oliver, that Oliver was reviewing the division's operations.

[157]*See supra* note 47.

regarding each of those registers, however, and do not even indicate for which classifications they have been established.

As for the Chief Court Clerk and Minute Clerk classifications that were mentioned by the Receiver in the December 31, 2002 Notice of contemplated disciplinary action delivered to Dr. Seaman,[158] there is evidence that work to establish registers for those job classifications was put "on hold" prior to the imposition of the receivership.[159] With respect to the Minute Clerk classification, however, the status report provided to the Receiver by Libby Miller, the assigned R&V Division staff member, states only the following,  in relevant part:

> **Position is a one incumbent classification (small N) in which *a provisional appointment* has been in place for 2 years.[160]  I have recommended to [the Classification and Compensation Division] to reclassify this position as an Administrative Coordinator in the future survey.
>
> Assigned:  Monday, 8/5/02
> Position had previously been assigned to Doris Dawkins/Becky Maze/John Seaman.  A task analysis had already been performed, however, KSAO's and MQ's had not been defined.[161]

There is no explanation for the two-year delay in completion of the assignment.

---

[158]It is unclear why the notice of contemplated disciplinary action was not issued until more than two months after Dr. Seaman was placed on administrative leave.

[159]*See* doc. no. 8 (transcript of hearing Mar. 13, 2003), at 553-56.

[160]*See supra* note 15.  Under the Board's rules, provisional appointments were limited to four *months*.  Defendant's Ex. 66, Rule 4.9(c).

[161]Defendant's Ex. 28 (emphasis added).

With respect to the Chief Court Clerk classification, Barry Jackson provided more detailed information in his status report to the Receiver.[162]  He provided a time line of activities, "because this study has taken so long."[163]  His report indicates that Becky Maze was assigned responsibility for the selection procedure on November 10, 1999, and on January 18, 2000 the certification request was cancelled by Birmingham Municipal Court Judge Barnes.[164]  Gordon Graham, who at the time was the personnel director for the City of Birmingham, requested on March 7, 2000 that the assignment be placed on hold, and further requested the Compensation and Classification Division to reclassify the position as "executive exempt."[165]  The effect of such a reclassification would have been to remove the position from the merit system and, thereby, not only deprive the occupant of merit system protections, but also free the appointing authority to hire persons without regard to qualifications.   The reclassification request was denied and, over the next year, the City continued to challenge the denial, until the issue finally was placed before the three-member Personnel Board at the Mayor's request in April of 2001.  The Board denied the reclassification request on June 21, 2001.  Jackson's status report states that the file

---

[162]Defendant's Ex. 30.

[163]*Id.* at 7.

[164]*Id.* at 8.

[165]*Id.*

contained no information to indicate what, if anything, occurred during the period of June 21, 2001 through January 11, 2002.[166]   The project was reassigned to Barry Jackson on July 22, 2002, and as of September 4, 2002, some fifteen months after the three-member Board had denied the City's reclassification request, the selection procedure for the position still had not been developed.[167]

Based on the foregoing, the court concludes that the Receiver's determination that development of registers of persons eligible for employment in the job classifications of Chief Court Clerk and Minute Clerk had not been completed in a timely manner was fully supported by the evidence.

Taken as a whole, the evidence shows that Dr. Seaman failed to apprehend the Receiver's sense of urgency to devise a strategy to develop valid selection procedures that complied both with acceptable professional practices, *and* with the legal requirements of the Board's consent decree.  When Dr. Seaman did provide responses to the Receiver pertaining to his "strategy" for accomplishing the work of his division, those responses were, although usually verbose, wholly lacking in meaningful information.  The need for the Board to change its methodology from *expediency* to *professionalism* should have been apparent from the mere fact that a

---

[166]*Id.*

[167]*Id.* at 11.

67

receivership was imposed on the Board by this court; and if that fact were not clear enough, then it should have been eminently clear from reading this court's memorandum opinion holding the Board in civil contempt, copies of which were made available for reading by all Board employees.

Accordingly, for all of the foregoing reasons, the court concludes that the Receiver's charge that Dr. Seaman failed to plan, develop, and implement a strategy to produce valid selection devices in a timely and professionally sound manner, and that certain registers were not prepared in a timely manner, should be sustained.

**B.     Charge No. 2:  Failure to distribute work assignments among the R&V Division staff reasonably and fairly which caused morale problems within the division.**

The Receiver objects to the magistrate judge's conclusion that the Receiver's determination that work assignments were inequitably distributed by Dr. Seaman, and that such practices negatively affected staff morale, was not supported by the evidence.  The court agrees with the Receiver.

On July 1, 2002, prior to the imposition of the receivership, Dr. Seaman submitted to Greg James his "plan" for reincorporating former Consent Decree team members into the R & V Division.  Dr. Seaman also provided a copy of the memorandum to the Receiver during their meeting on July 17, 2002, the second week of the receivership.  Dr. Seaman's "plan" was woefully lacking in specificity:

At the time of this report, it is expected that 4-5 staff members currently assigned to the consent decree work group will be reassigned to the non consent decree work group. When reassigned, those staff members will be called to assist with [establishing registers as timely as possible for 90+ standing testing projects], but will be directed to primarily work on carrying out [preparing for, coordinating, and administering Public Safety promotional and entry level testing to replace aging registers], as registers are needed, and also to perform work on [projecting staffing needs in the system and developing registers in advance to reduce reliance on provisional appointments].

The Receiver first addressed the issue of work assignments with Dr. Seaman during their July 17th meeting. By that date, the Receiver had met with division managers and other employees in an effort to gain an understanding of their concerns. During the evidentiary hearing, the Receiver testified that he had received feedback from former "Consent Decree team" members who had returned to the R&V Division that they were underutilized by Dr. Seaman. Given Dr. Seaman's position that his division was understaffed,[168] the Receiver told Dr. Seaman that he needed to more effectively employ his existing staff resources. The Receiver again discussed his perception that Dr. Seaman had not effectively distributed the workload of the R&V Division following the August 30th meeting.

Indeed, Dr. Seaman acknowledged that there was discord among his staff

---

[168]The magistrate judge observed that Dr. Seaman had complained that he was understaffed since as early as 1999, when he addressed the issue with the court's Special Master, Dr. Veres (who the magistrate misidentified as "then-Director John Veres"). Doc. no. 9 (Report & Recommendation), at 81.

regarding work assignments:

I explained [the rationale for work assignments] to my staff, in fact, *because there was some grumbling about the — what early on appeared to be disproportionateness in assignments*. And I made it clear that the [former Consent Decree team members] — first of all, some of them were continuing to look at some consent decree projects. They were on call, if you will, to be able to respond to questions from attorneys, parties in the case, what have you, about the characteristics of those exams that they had worked on because there were problems with some of those. And that's as it should be.

Others were used to look at some of the public safety testing that had originated — most recently originated with their group and to be prepared to coordinate the facilitation of those testing programs again.

But I made it clear to my staff that in that regard, these people, as they started getting assignments, they were going to be employing best practices approaches; meaning, they were going to apply steps, hopefully, as consistent with the standards of [the *Uniform Guidelines*] as possible, develop tests that were fair, equitable, job-related, fair to examinees consistent with the steps outlined in the guidelines to defend, if you will, employment examinations if they result — if their use results in adverse impact against any protected groups.

In effect then, I was telling them that, *although there's maybe a little disproportionate — apparent disproportionateness in assignments,* you folks over here are going to be cleaning out these things that we've been doing under expedient practices.

We're going to get those out of the way, and we're going to bring you into the fold by working with some of these folks that have come downstairs in sort of a mentoring fashion to bring you along to start doing best practices on some of the new assignments. But we're going to clean those things out, and those are much easier, these expedient approaches, as we had been doing. There is a lesser degree of job analysis involved to establish the job relatedness of the instruments we

sought to employ.

> There are a whole host of steps that, under a best practices
> approach, would not be taken with those.  I wanted to clean those out,
> and also inform them that the staff carrying the best practice approaches
> would be working just as hard in the sense that they may have been
> carrying fewer assignments, but the degree of rigor that they needed to
> apply to conducting those projects in terms of job analysis, working with
> subject matter expert groups and what have you was equally demanding,
> if not more demanding, than the work they were going to be doing
> closing out those projects.  That was my decision in balancing the work
> and moving the work forward as it should be.[169]

Additionally, Lorren Oliver discussed this issue with Dr. Seaman during his

review of the R&V Division's operations:

> What [Dr. Seaman] communicated to me when I made the
> observation that there was a significant imbalance is that he would
> attempt to [redistribute the work].  He did not share with me that there
> was an existing limitation to his ability to do that.  I shared with him the
> observation that it appeared as if functionally the consent decree folks
> were still in that position.

> I said, are they now under your supervision?  And he said, yes,
> they have been for some time.  My question therefore was, why not have
> them assigned projects, particularly given the fact that they appear, on
> the basis of his assessment, to be very capable.[170]

Notwithstanding the foregoing, Dr. Seaman did not redistribute the workload among

staff working within the R&V Division.

The record is crystal clear that both the Receiver and Lorren Oliver — after

---

[169]Doc. no. 8 (transcript of Mar. 13, 2002 hearing), at 579-81 (emphasis supplied).

[170]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 405.

reviewing assignment sheets compiled by R&V Division staff members, and discussing workload issues with R&V Division staff and Dr. Seaman — instructed Dr. Seaman to redistribute work assignments.  Dr. Seaman did not do so, but only offered explanations for his method of assigning work.

## C.   Charge No. 3:  Failure to establish an effective method for tracking and evaluating the work product of the R&V Division, and failure to forecast for creation of new registers and to take proactive measures to meet demand when it accrued.

The Receiver objects to the magistrate judge's conclusion that this charge could not be sustained, because the Receiver relied on "inadequate information, sloppy investigation, lack of communication between [the Receiver], Greg James, and Lorren Oliver, and a failure to provide Dr. Seaman with sufficient time or more specific instructions."[171]

The magistrate judge found significant the fact that, "as of the time of the hearing in this case, . . . no *computerized* tracking system was yet in place."[172]  While that statement is accurate, it is not relevant to the issue.  The Receiver testified that "a tracking system focuses on being able to identify critical decision points, being able to track work progress, and supervision of work progress. . . . I don't see that you have to have a *computerized system* to track it.  *That's not what I'm talking about at*

---

[171]Doc. no. 16 (Receiver's objections), at 55 (quoting Report and Recommendation at 109).
[172]Doc. no. 9 (Report and Recommendation) at 108 (emphasis supplied).

*all."*[173]   Moreover, Lorren Oliver clearly testified that"the work occurring is being

fully supervised."[174]

The magistrate judge also found that the Receiver did not have all of the

relevant information pertaining to Dr. Seaman's efforts to develop and implement a

tracking system prior to initiating disciplinary action against him, and excused Dr.

Seaman's failure to forecast the testing procedures necessary for the preparation of

new registers, stating that "[the Receiver] asked Dr. Seaman how he [forecasted] but

instructed him no further when he was advised by Seaman that he had no consistent,

uniform method of forecasting."  Finally, the magistrate judge concluded with respect

to this charge that the Receiver:

> relied, again, on inadequate information, sloppy investigation, lack of
> communication between [sic] [the Receiver], Greg James and Lorren
> Oliver, and a failure to provide Dr. Seaman with sufficient time or more
> specific instructions on how Dr. Sims desired for him to accomplish his
> tasks, including this one.  Under the circumstances, the termination of
> Dr. Seaman under Charge III is inappropriate.[175]

Upon full review of the evidence, this court reaches contrary conclusions.

The Receiver testified that he *was aware* of Dr. Seaman's efforts to implement

a tracking system, through his review of the memoranda that Dr. Seaman had

---

[173]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 484 (emphasis supplied).

[174]Doc. no. 7 (transcript of hearing, Mar. 12, 2003), at 395.

[175]Doc. no. 9 (Report and Recommendation), at 109.

prepared for Greg James and relating to Dr. Seaman's progress in developing a tracking system — namely the memoranda dated September 1st, 14th, 23rd, and 29th.[176]  Although the September 23rd memorandum stated that the tracking system was "nearly in place," it was not mentioned at all in the September 29th memorandum.  The Receiver also was aware, via Dr. Seaman's memorandum to him dated September 6, 2002, of Dr. Seaman's efforts to develop a tracking system.  Although the magistrate judge faults the Receiver for failing to express his dissatisfaction to Dr. Seaman with his lack of progress in implementing a means to track the work of the R&V Division, or to ask to see what Dr. Seaman had developed to date, neither did Dr. Seaman take the initiative to do anything more than tell the Receiver that he was "working" on development of a system.

The significance of Dr. Seaman's failure to track the work of the R&V Division became apparent when Lorren Oliver was asked by the Receiver to assess the division.  Dr. Seaman was unable to provide meaningful information pertaining to the status of each pending selection procedure, and Oliver ultimately had to obtain the information piecemeal, from each staff member working in the division.

Likewise, during one of their initial meetings, Dr. Seaman admitted to the

---

[176]Doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 492 ("[T]he first [report] I got was on [September] 14th.  So the ones I read were [plaintiff's] Exhibits 18 [September 14th report], 19 [September 23rd report], 21 [September 29th report], and 17 [September 1st report].") (testimony of Dr. Sims).

Receiver that he had no method to forecast demand for selection procedures.  The magistrate judge apparently believed that, at that point, the Receiver should have given, but failed to give, Dr. Seaman specific instructions on how to discharge the duties of his position.  The Receiver testified, however, that, when Dr. Seaman told him he had no method of forecasting:

> I told him *how could you not forecast* given the fact that . . . you have an ongoing cycle of requests for certifications, exams expiring, calls from different jurisdictions' appointing authorities.  And that *it would seem, at the minimum, if you are doing a good job of planning and organizing your work, you would have a process in place that allows you to be able to be proactive.*[177]

Dr. Seaman confirmed his *reactive* approach to the division's work in the September 5, 2002 memorandum he prepared for the Receiver following the Receiver's August 30th meeting with the R&V Division:

> [A]ssignments have typically been made *when the need for a register was determined upon receipt of a request for certification.* Whereas some forecasting was done insofar as public safety testing programs (i.e., putting new registers in place approximately every 24 months) and some of the clerical positions, *no systematic, forecasting practices have been in place.*[178]

Overall, the evidence shows that the Receiver appropriately believed that "tracking" (*i.e.*, forecasting the dates when new testing procedures would have to be

---

[177]*Id.* at 442 (emphasis supplied).

[178]Defendant's Ex. 22 (emphasis supplied).

administered, so that registers of persons eligible for employment would be in place when needed), *and* closely supervising the work of the R&V Division, were critical components of successfully fulfilling the court's charge of bringing the Board into compliance with the legal requirements of its consent decree.  Based on information provided by Dr. Seaman *himself*, the Receiver determined that Dr. Seaman's lack of tracking, forecasting, and supervision was not adequate.  Accordingly, the court concludes that this charge was substantiated, and properly serves as a basis for termination.

**D.     Charge No. 4:  Failure to take corrective measures when it was brought to Dr. Seaman's attention that a staff member, for months, had failed to score all applications even though the registers had been established, and failure to inform the Receiver of the problem.**

The Receiver asserts that the magistrate judge erred in concluding that this charge was not substantiated, because the magistrate improperly focused on irrelevant conflicts in the evidence, and also because his finding that "[t]he claim that Dr. Seaman was told to tell the Receiver about [the] problem is lacking in merit" was contrary to the evidence.  Again, the court finds that the Receiver's objections have merit.

When addressing this charge, the magistrate judge focused on the conflict in the testimony of Greg James and Andy Douglas, as to whether James had instructed

76

Douglas to tell Dr. Seaman to bring the matter of Cynthia Dowe's failure to score applications to the attention of the Receiver.  The magistrate judge wrote:

> The testimony of Greg James was that he told Andy Douglas to tell Dr. Seaman to tell [the Receiver] about this problem.  Assuming Douglas was given such an assignment, James has no personal eyewitness evidence that he carried out this instruction.  In fact, Douglas denies that Greg James told him to speak to Dr. Seaman and further testified that James told him to keep the information private.
>
> . . . .
>
> There is no credible evidence that [Dr. Seaman] was instructed to tell the Receiver about this problem and refused to do so.[179]

Notwithstanding the conflicting testimony noted by the magistrate judge, there is other, uncontroverted testimony that:  (i) Andy Douglas discovered that Cynthia Dowe had failed to score applications several months after they had been received; (ii) Douglas informed Dr. Seaman of the problem; (iii) Douglas recommended that Dr. Seaman advise the Receiver of the matter; and (iv) Dr. Seaman failed to inform the Receiver about the issue prior to the date on which he was placed on administrative leave.[180]  Thus, the magistrate judge's conclusion that Dr. Seaman was not told to bring the problem to the Receiver's attention not only is incorrect, but irrelevant.

---

[179]Doc. no. 9 (Report and Recommendation) at 110, 112.

[180]*See* doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 90 (testimony of Dr. Seaman); 185-86, 188 (testimony of Andy Douglas).

The crux of this charge is that Dr. Seaman failed to address a significant performance issue in his division, and also failed to advise the Receiver of the problem, as the Receiver had instructed all division managers to do.[181]  Dr. Seaman explained that he requested Douglas to provide "more information" about the unscored applications, but Douglas had not done so by the time he (Dr. Seaman) was placed on administrative leave.  Douglas, however, testified that he *did provide* the information to Dr. Seaman a day or two following their initial conversation, and that Dr. Seaman simply stated that there was nothing he could do about the problem.[182]

The magistrate judge appeared to credit Douglas's testimony that he provided the information to Dr. Seaman, stating the following:

> If Douglas did provide this information to Dr. Seaman, it was provided only a few days before Dr. Seaman was placed on leave pending termination.  It would not be surprising to discover that his attention was diverted to other matters at that time or that he simply does not remember receiving this information.[183]  However, whether he received it or not is of no importance.  It is clear that he took action and ordered Douglas to provide him with further information.[184]

Upon review of the evidence, this court concludes that, regardless of whether Dr. Seaman received additional information from Douglas, he failed to take

---

[181]*See* doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 436 ("I expected [the division managers] to also . . . be honest, bring problems to my attention.").

[182]Doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 188.

[183]There is *no evidence* to support these *suppositions*.

[184]Doc. no. 9 (Report and Recommendation) at 110-11.

*corrective* action to address what the Receiver perceived to be a significant performance problem[185] within the R&V Division after learning of the matter.[186] Crediting Dr. Seaman's testimony that he did not receive the information that he requested from Douglas, there is no evidence that he followed up on the request, even though "[i]t was on [Dr. Seaman's] agenda," and was "something that [he] was waiting to deal with" as of the date that he was placed on administrative leave.[187]  Dr. Seaman also acknowledged that he did not advise the Receiver that Douglas had brought the issue to his attention, and that he was investigating the matter.[188]  The court therefore concludes that there is a sufficient basis in the evidence to support this charge.

## IV. CONCLUSION

The issues raised in this case may appear complex.  The magistrate judge obviously found them to be so.  That is somewhat understandable.  Technical professionals, such as Dr. Sims, Lorren Oliver, and Dr. Seaman, are not good courtroom communicators.  Their education, and the esoteric concepts they are trained to use, teach them to speak in an arcane jargon that is, for most persons,

---

[185] *See* doc. no. 8 (transcript of hearing, Mar. 13, 2003), at 462-63.

[186] *See* doc. no. 6 (transcript of hearing, Feb. 27, 2003), at 91.

[187] *Id.*

[188] *Id.* at 91-92.

difficult to grasp.  This court was required to acquire dictionaries[189] and texts[190] as aids to comprehension, to better follow whatever such persons were attempting to communicate.

Ultimately, however, this is a very simple case, in the sense of the following, illustrative example.  The subordinate officers of General Thomas J. Jackson once recoiled from a command that Jackson's Brigade execute a maneuver that, they believed, would result in staggering casualties.  Jackson checked the debate with one statement:  "My duty," Jackson said, "is to obey orders."

In like manner, this court's duty is that of obeying the orders communicated through the opinion in *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548 (11th Cir. 1994) ("*Ensley II*"), holding (among many other things) that the decision of this court, "declin[ing] to set deadlines for the development of valid selection procedures," amounted to "*an abuse of discretion*,"[191] and ordering that the provisions of the Board's consent decree requiring the development and implementation of valid, non-

---

[189]W. Paul Vogt, DICTIONARY OF STATISTICS & METHODOLOGY (1999); Ray Corsini, THE DICTIONARY OF PSYCHOLOGY (2002).

[190]*E.g.*, Robert D. Gatewood & Hubert S. Feild, HUMAN RESOURCE SELECTION (5th ed. 2001); Gerald R. Ferris & M. Ronald Buckley, HUMAN RESOURCES MANAGEMENT (3d ed. 1996); Linda Crocker & James Algina, INTRODUCTION TO CLASSICAL & MODERN TEST THEORY (1986); Mario F. Triola, ELEMENTARY STATISTICS (8th ed. 2001); Gerald Kranzler & Janel Moursund, STATISTICS FOR THE TERRIFIED (2d ed. 1999).

[191]*Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1573 (11th Cir. 1994) (emphasis supplied).

discriminatory, job-selection procedures "*be given teeth*"[192] — all for the purpose of

*ensuring* that the Board accomplished those tasks "*forthwith*, *not at the causal pace*

*the Board has passed off as progress for thirteen* [now 23] *years.*"[193]

> Valid tests may prove administratively burdensome to design and
> validate, but minimizing inconvenience is not a constitutional value. It
> certainly does not outweigh the importance of ending racial [or gender]
> discrimination. If the process of approving selection procedures places
> undue strain on the district court's resources, it may appoint a special
> master to assist with the task.
>
> . . .
>
> Valid selection procedures are both possible in practice and
> constitutionally necessary. Therefore, on remand, the district court
> should set prompt deadlines for the City and the Board to develop and
> implement valid job-selection procedures.[194]

This court faithfully sought to discharge those orders from October 2000 until July

8, 2002, when it became apparent that the Board and its employees either had no

---

[192]*Id*. at 1572 (emphasis supplied).

[193]*Id*. at 1577 (emphasis supplied).

[194]*Id*. at 1574, 1575. This court's reading of the lengthy opinion in *Ensley II* led to these conclusions:

> In sum, the *Ensley II* Court clearly commanded that this court's *ultimate*
> objective should be that of aggressively compelling the Personnel Board and City of
> Birmingham to develop "valid, non-discriminatory selection procedures" in
> accordance with specific, "prompt deadlines" and "formal review mechanism[s]" to
> "ensure" that the Board and City "actually did" "develop and implement valid job-
> selection procedures." The Court explicitly refused to describe that objective as
> "long term," "because it should be pursued with a sense of urgency."

*United States v. Jefferson County*, No. CV-75-S-666-S (N.D. Ala. July 8, 2002), at 21 (citations omitted).

intention of complying with federal Constitutional, statutory, and court-ordered requirements, or lacked the competence to do so (or both of the foregoing). Hence, the imposition of a Receivership upon the Board and its employees.

This court ordered Dr. Sims to take command of the Personnel Board's employees, and to bring the Board into full compliance with the legal obligations incorporated in its consent degree as quickly as possible, and "concluding this litigation in fewer than three years."[195]

> The Personnel Board obviously must employ valid selection criteria in order to comply with its consent decree, as modified and extended. The Board's ability to create and then administer selection procedures is hamstrung, however, by its lack of infrastructure and the discord among its present management and staff. To perform its functions lawfully and efficiently, the institution must have an organizational structure, systems, and procedures that support its purpose, and employees who both understand and possess the skills necessary to perform their various roles.

> Ultimately, the purpose of the Personnel Board is to deliver efficient, professional, and cost-effective service to local governments, their employees, applicants for employment, and the public at large. Central to the work of the Receiver, therefore, will be the task of refocusing the Personnel Board and its employees on the potential and satisfaction of working in an organization that not only fulfills its mission, but does so in an exemplary manner. Otherwise, the task of sustaining "valid selection criteria" will prove impossible, if not meaningless.

> Accordingly, the overriding goal of the receivership imposed by

---

[195]*Id*. at 100.

this court is that of creating an instructive collaboration among the Receiver and Board employees, with the advice of consultants, so that authority and responsibility are progressively assumed by the Board and its employees during the course of the process, resulting in the legacy of a strong and competent Personnel Board team with a clearly defined mission, and, the systems and skills to support that mission in a manner that meets the requirements of the Constitution and federal law in all respects.  The cumulative effect of the protections afforded by a well-run, efficient, and professional merit system are a sense of procedural justice and a resultant sense of job security.  The protections foster a neutral and non-partisan career civil service, one based more on job performance than on political affiliation.  In short, the same benefits touted in the original struggle for enactment of Act No. 284, but made consistent with contemporary legal requirements.[196]

Dr. Sims accepted this court's mission statement, and has diligently and faithfully sought to discharge his directives.  In contrast, Dr. Seaman (in Greg James's apt phrase) never got "on board."  Dr. Seaman was a pivotal part of the Board's problems for the ten or more years he served as manager of the Research & Validation Division; and, he either refused to be, or was incapable of becoming, a part of its solution.  His duty, like that of General Jackson, was to obey the orders of his superiors:  the Receiver and, ultimately, this court.  This record establishes that he failed to do so.

Accordingly, for all of the foregoing reasons, the court rejects the findings of the magistrate judge, and declines to adopt his recommendation.  The court instead

---

[196]*Id*. at 98-99.

finds that each of the Receiver's charges is sustained by the evidence, and concludes that his decision to terminate the employment of Dr. Seaman should be affirmed.  In accordance with the rules and regulations of the Personnel Board in effect at the time of Dr. Seaman's dismissal, the court is not convinced that Dr. Seaman, by reason of his acts as charged and his record of service, merits retention in the service; rather, the evidence convinces this court that Dr. Seaman should be removed therefrom.  An appropriate order will be entered contemporaneously herewith.

DONE this 7th day of February, 2005.

_____
United States District Judge